REVISED, September 8, 1998

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

―――――――――――――

Nos. 93-4452 through 93-4611

―――――――――――――

CLAUDE CIMINO, ET AL.,

Plaintiffs-Appellees,
Cross-Appellants,

versus

RAYMARK INDUSTRIES, INC., ET AL.,

Defendants,

PITTSBURGH CORNING CORPORATION and
ASBESTOS CORPORATION LIMITED,

Defendants-Appellants,
Cross-Appellees.

―――――――――――――

Appeals from the United States District Court for the
Eastern District of Texas

―――――――――――――

August 17, 1998

Before REYNALDO GARZA, GARWOOD and DAVIS, Circuit Judges.

GARWOOD, Circuit Judge:

Before us are appeals and cross-appeals in personal injury and wrongful death damage suits against several manufacturers of asbestos-containing insulation products and some of their suppliers, the district court's jurisdiction being based on diversity of citizenship and the governing substantive law being that of Texas. This is the same set of cases addressed in *In re*

*Fibreboard*, 893 F.2d 706 (5th Cir. 1990), but the judgments now before us result from a trial plan modified following that decision.[1] Principally at issue on this appeal is the validity of that modified trial plan.

The district court originally consolidated the some 3,031 such cases then pending in the Beaumont Division of the Eastern District of Texas for trial of certain common issues under Fed. R. Civ. P. 42(a) and also certified a class action under Fed. R. Civ. P. 23(b)(3), the class generally consisting of the insulation and construction workers, their survivors and household members, who were plaintiffs in those pending cases. As explained in more detail below, the trial plan ultimately implemented after *Fibreboard* consisted of three phases, generally described as follows. Phase I comprised a complete jury trial of the entire individual cases of the ten class representatives and also a class-wide determination of issues of product defectiveness, warning, and punitive damages (including a multiplier as to each defendant). Phase II, which was to address exposure on a craft and job site basis, was dispensed with on the basis of a stipulation. In phase III, 160 different individual cases ("sample cases"), some from each of the five different allegedly asbestos-related diseases included in the entire group of underlying cases, were tried to two other juries to determine only each of those individual sample case

---

[1]Of the district court's several orders with reasons and opinions in these cases, two are published. *Cimino v. Raymark Industries*, 751 F.Supp. 649 (E.D. Tex. 1990); *Cimino v. Raymark Industries*, 739 F.Supp. 328 (E.D. Tex. 1990).

2

plaintiffs' respective actual damages from their asbestos-related disease.  Thereafter, and following a one-day bench hearing on the basis of which the district court determined that in each disease category the 160 sample cases were reliably representative of the cases involving the like disease among the remaining some 2,128 cases,[2] the court ruled that each of these remaining 2,128 cases (the "extrapolation cases") would be assigned by the court to one of the five disease categories and each would be entitled to judgment based on an amount of actual damages equal to the average of the verdicts rendered in those of the 160 sample cases involving the same disease category.[3]  Punitive damages in each case would be essentially based on the phase I verdict.

By the time of the phase I trial, many of the defendants had settled and others had taken bankruptcy or otherwise been disposed of, so only five remained, namely appellant Pittsburgh Corning Corporation (Pittsburgh Corning), Carey Canada, Celotex, Fibreboard, and appellant Asbestos Corporation, Limited (ACL).  The case against ACL was tried to the court under the Foreign Sovereign Immunities Act, 28 USC §§ 1330(a), 1603(b).  By the time the amount of the extrapolation case judgments was to be calculated, all defendants except Pittsburgh Corning and ACL had passed out of the

---

[2]By the time of the phase I trial, the original 3,031 total cases had been reduced to 2,298 by settlement, severance, or dismissal.

[3]Remittiturs were ordered as to 35 of the 160 sample case verdicts, and the averages were computed using the thus reduced verdict figures as well as the 12 zero verdicts.

3

case.[4]

Judgment was entered against ACL in only two of the ten class representative cases (and in none of either the phase III sample cases or the extrapolation cases). Judgment was actually entered against Pittsburgh Corning in a total of 157 cases, consisting of 9 of the class representative phase I cases, 143 of the phase III sample cases, and 5 of the extrapolation cases (1 from each of the 5 different diseases included in the class).[5] In these 157 cases, Pittsburgh Corning has been cast in judgment for a total of approximately $69,000,000.[6] Pittsburgh Corning and ACL each appeal the referenced judgments entered against them, and the plaintiffs

---

[4]After the phase I trial and before the phase III trial began, the district court dismissed all claims for actual damages against Carey Canada, finding there could be no evidence any plaintiff was exposed to its product (and the four contrary phase I verdicts were set aside); although the court opined that Carey Canada would nonetheless be liable for punitive damages, it appears that no such judgment was rendered and the case against Carey Canada was apparently severed. After the phase III trials were completed, Celotex filed for bankruptcy and was severed, and Fibreboard settled.

[5]In one of the ten class representative cases, the phase I jury returned a verdict for all defendants; the district court subsequently granted a new trial in that case, and it has been severed. After the phase III trial, the district court granted Pittsburgh Corning's motion for judgment in 17 of the 160 sample cases. Pittsburgh Corning is the sole defendant in all but 2 of these 157 judgments; in two of the class representative judgments it and ACL are both cast in judgment (ACL for actual damages only).

[6]Pittsburgh Corning asserts, without dispute, that the orders for judgment in the remaining some 2,123 extrapolation cases (in which judgments have not been entered) call for judgments against Pittsburgh Corning in the approximate total amount of $1,300,000,000 for actual damages only, excluding prejudgment interest and punitive damages.

4

cross-appeal as to each.[7]  The issues presented in the ACL appeal and cross-appeal are few and narrow, and we address them last.

Pittsburgh Corning's appeal presents essentially two groups of contentions, summarized as follows:  first, those challenging the implemented *Cimino* trial plan as a whole, particularly its asserted failure to properly try and determine individual causation and, in the five extrapolation cases, damages also, as to any plaintiffs other than the class representatives, assertedly contrary to our decision in *Fibreboard* and Texas substantive law and in derogation of Pittsburgh Corning's Seventh Amendment and Due Process rights; and second, various other issues of a more particular and traditional sort.  Plaintiffs' cross-appeal presents issues of only the latter variety.  We now turn to consider Pittsburgh Corning's appeal, addressing first its attacks on the trial plan.

I.

PITTSBURGH CORNING APPEAL

**A.  Trial Plan Attack**

1.  Trial Plan

*Initial Plan*

The *Cimino* trial plan initially adopted by the district court, which we subsequently set aside in *Fibreboard*, also called for three phases.  In phase I, the jury would decide which, if any, of each defendant's products were defective as marketed and unreasonably dangerous, when each defendant knew or should have

---

[7]The 157 judgments appealed have been certified under Fed. R. Civ. P. 54(b).

5

known workers or their household members were at risk, whether each defendant was guilty of gross negligence in marketing its offending product and, as to each defendant so guilty, a punitive damages multiplier.  In phase II, the same jury would decide the percentage of plaintiffs in the class exposed to each defendant's products, the percentage of claims barred by limitations and other defenses, and would determine a lump sum amount of actual damages for each disease category for all plaintiffs in the class.  The jury in this phase would also make a full determination of liability and damages with respect to each of the eleven class representatives individually.  And the jury in phase II would also hear such evidence as the parties desired to present from up to thirty other illustrative plaintiffs, fifteen chosen by the defense and fifteen by plaintiffs, as well as expert testimony regarding the total actual damages of the class, such expert testimony to be based, among other things, on questionnaires filled out by all class members and other discovery, including forty-five-minute oral depositions of class members taken by defendants.  In phase III, to be non-jury, the court would distribute the awarded damages among the individual class members.[8]

---

[8]In adopting that plan, the district court adverted to its earlier decision in *Jenkins v. Raymark Industries*, 109 F.R.D. 269 (E.D. Tex. 1985), *aff'd*, 782 F.2d 468 (5th Cir. 1986).  However, the district court declined to follow its *Jenkins* format, noting that "[t]rying these [3,000] cases in groups of ten would consume the entire available trial time for the Court . . . for the next three years."  In *Jenkins*, the district court had adopted and we had sustained a class action trial plan for similar asbestos suits which provided for a class-wide trial of essentially the same phase I common issues, but to be followed by "consolidated mini-trials of four to ten plaintiffs on the issues of exposure to any products

*Fibreboard*

In *Fibreboard*, we found "no impediment to the trial of Phase

I," *id*. at 712, but held the balance of the plan invalid, stating:

> "It infringes upon the dictates of *Erie* that we remain
> faithful to the law of Texas, and upon the separation of
> powers between the judicial and legislative branches.
>
> "*Texas* has made its policy choices in defining the
> duty owed by manufacturers and suppliers of products to
> consumers.    These   choices   are   reflected   in   the
> *requirement that a plaintiff prove both causation and
> damage.   In Texas*, it is a 'fundamental principle of
> traditional products liability law . . . that the
> plaintiffs must prove that the defendant supplied the
> product which caused the injury.'  *These elements focus
> upon individuals, not groups*.  The same may be said, and
> with even greater confidence, of wage losses, pain and
> suffering, and other elements of compensation.  These
> requirements   of   proof   define   the   duty   of   the
> manufacturers.
>
>       . . . .
>
>       . . . The inescapable fact is that the individual
> claims of 2,990 persons will not be presented.  Rather,
> the claim of a unit of 2,990 persons will be presented.
>
>       . . . .
>
>       . . . That procedure *cannot focus upon such issues
> as individual causation*, but ultimately must accept
> general causation as sufficient, *contrary to Texas law*.
> It is evident that these statistical estimates deal only
> with general causation, for 'population-based probability
> estimates do *not* speak to a probability of causation in
> any one case; the estimate of relative risk is a property
> of the studied population, not of an individual's case.'
> *This type of procedure does not allow proof that a*

---

previously found to be defective; any damages legally caused by
such  exposure;  and  any  comparative  fault  of  each  plaintiff  in
incurring such damages."  *Id*. at 282.  *See also id*. at 284 (". . .
the mini-trials preserve the individual issues of product exposure
for each member of the class with regard to each product (if any)
found  defective  in  the  class  action  phase"),  and  our  *Jenkins*
opinion at 473 ("individual issues of the unnamed class members
would  be  resolved  later  in  'mini-trials'  of  seven  to  ten
plaintiffs.").

*particular defendant's asbestos 'really' caused a particular plaintiff's disease; the only 'fact' that can be proved is that in most cases the defendant's asbestos would have been the cause." Id.* at 711-712 (footnotes omitted; emphasis added except in interior quotation and in last clause).[9]

*Present Plan*

Following this Court's decision in *Fibreboard*, the district court initially determined that "[t]his case will now proceed under the procedures set out in *Jenkins v. Raymark*"—i.e. phase I to be followed by a series of mini-trials for all plaintiffs on their individual causation and damage issues (see note 8, *supra*)—and set its previously adopted phase I (which we had declined to block) for trial.[10] The court observed that its "task appears to be insurmountable," but stated that it would nonetheless "take[] its place behind the old mule and start down that long row."

Some months later, however, the court changed its mind and adopted the trial plan now before us (except that a stipulation was ultimately utilized instead of phase II), observing:

> "Phase One will leave unresolved the questions of exposure, comparative causation, and damages. These remaining questions could easily be resolved by the procedure established in *Jenkins* if the numbers were

_____

[9]We also stated:

> "Finally, it is questionable whether defendants' right to trial by jury is being faithfully honored, but we need not explore this issue. It is sufficient now to conclude that Phase II cannot go forward without changing Texas law and usurping legislative prerogatives, a step federal courts lack authority to take." *Id.* at 712.

[10]As its "only modification" to its previous phase I, the district court provided that "a trial on the merits of the [entire individual cases of] the class representatives . . . will now be submitted to the jury in Phase I."

8

manageable.  The numbers are not manageable.  *Jenkins* envisioned groupings of ten plaintiffs submitted to a succession of juries.  If we could try one group a week, the process would take 4½ years.  Additional judicial power and the utilization of multiple courtrooms could shorten the time to resolve all these cases, but it would not decrease total court time or attorney time.  Transaction costs to the parties under the *Jenkins* procedure is unacceptable."

Instead of utilizing the *Jenkins* procedure, the court determined to employ new phases II and III:  "asking the jury in Phase Two to make findings on exposure that are specific to job site, craft and time; and then by submitting to a jury in Phase Three individual damage cases of a statistically significant, randomly selected sample from each of the five disease categories." For purposes of phase II, twenty-two different worksites—principally refineries, shipyards, and chemical plants, and also including other industrial-type facilities and a power plant—in Beaumont, Port Arthur, Orange, and Port Neches, Texas, and including two sites in Lake Charles, Louisiana, would be considered.[11]  The district court contemplated that the phase II jury (the same jury as in phase I) would:

"hear evidence concerning:  (a) the presence of the Defendants' products at the worksites; (b) the presence of asbestos dust at the worksites; and (c) the nature of the various crafts at the worksites and the relationship between these crafts and the presence of asbestos dust at these facilities.  Specifically, the jury will hear evidence concerning the working conditions of machinists, pipefitters, insulators, carpenters, etc. and the relationship between these workers and the Defendants' asbestos products.  The jury will make a determination as

_____

[11]Although two of the twenty-two sites were in Louisiana, the district court, and all parties both below and on this appeal, have proceeded on the basis that in this diversity case the controlling substantive law is that of Texas, and we do likewise.

9

to which crafts at the worksites were exposed to which Defendants' asbestos products (if any) for a sufficient period of time to cause injury, harm, or disease.

The Court will make a non-jury determination as to which Plaintiffs or Plaintiffs' decedents worked for a sufficient period of time at each worksite so as to be a proper member of that worksite's group and which Plaintiffs were proper members of each of the crafts at these worksites. . . .

The Court will submit the issue of exposure to the jury pursuant to ten-year intervals. So, for example, the jury will be asked whether the product(s) of Defendant X were present at Worksite Y during the 1940's, the 50's, 60's, etc. And, for example, the jury will be asked whether the carpenters at Worksite Y were exposed to Defendant X's product(s) during the 1940's, the 50's, 60's, etc.

. . . .

During Phase Two, the jury will apportion responsibility among settling and non-settling Defendants for the Plaintiffs' exposure (if any)."

In Phase III, two other juries would determine for 160 sample cases only "two damage issues," namely "(e) whether the Plaintiffs suffered from an asbestos-related injury or disease and, if so, (b) what damages the Plaintiffs incurred." The court ultimately determined, based on information from plaintiffs, that the entire class of 2,298 cases could be broken down into the 5 disease categories, and the court then randomly selected 160 sample cases, some from each disease category, as follows:

| Disease | Number of Sample Cases | Number of Cases in Class |
|---------|------------------------|--------------------------|
| Mesothelioma | 15 | 32 |
| Lung Cancer | 25 | 186 |
| Other Cancers | 20 | 58 |
| Asbestosis | 50 | 1,050 |
| Pleural Disease | 50 | 972 |

10

Total                          160                        2,298[12]

[12]A brief description of asbestos-related diseases is contained in Schuck, *The Worst Should Go First: Deferral Registries In Asbestos Litigation*, 15 Harv. J.L. & Pub. Pol. 541 (1992). Five conditions are described, "[m]oving from the least to the most serious," as follows: "(1) pleural plaque; (2) pleural thickening; (3) asbestosis; (4) lung and certain other cancers; and (5) mesothelioma (a rapidly-fatal form of cancer)." *Id*. at 544. "The pleurae are a double membrane surrounding the lung between the lung and chest wall. The inner layer, adjacent to the lung tissue, is called the visceral pleura. The outer layer, in close contact with the inner, is called the parietal pleura." *Id*., n.10.

"Pleural plaques have been described as 'discrete, elevated, opaque, shiny, rounded lesions, . . . diffuse or nodular,' of the parietal pleura or diaphragm. They strongly indicate asbestos exposure. Pleural thickening includes certain types of lesion of the visceral pleura. Unlike plaques, pleural thickening may have non-asbestos causes. Asbestosis involves non-malignant lesions of the lung tissue itself, varying from small areas of basal fibrosis to a diffuse, fine fibrosis. . . . Malignant mesothelioma, a usually rapidly-fatal form of cancer, is caused almost exclusively by asbestos. Lung cancer can also be caused by asbestos, a risk greatly compounded by smoking. Whether asbestos exposure is associated with other types of cancer remains a matter of considerable debate in the medical and legal communities.

. . . The medical literature indicates that claimants with pleural plaques unaccompanied by asbestosis are ordinarily symptomatically unimpaired. Some studies have associated pleural plaques with comparatively modest breathing decrements, but many such studies have been criticized on various grounds. It is clear that diffuse pleural thickening and some of its variants can produce significant impairments, although thickenings are less common than plaques. Asbestosis '[s]ymptoms include shortness of breath, coughing, fatigue, and vague feelings of sickness. When the fibrosis worsens, shortness of breath occurs even at rest. . . . In severe cases, death may be caused by respiratory or cardiac failure.'

. . . Pleural plaques are certainly markers of prior asbestos exposure, but the existing studies provide no evidence that they independently cause any progression of further asbestos-related conditions. As for asbestosis, the evidence suggests that once the disease is contracted, the symptoms tend to become progressively

Individual judgment would be entered in each of the 160 sample cases based on the phase III verdict in that particular sample case. After phase III, the district court would assign each of the remaining 2,298 cases to one of the 5 disease categories, and in each case make an award of actual damages equal to the average of the awards in the phase III cases involving the same disease.

*Phase I*

The phase I trial lasted approximately eight weeks. The defendants then remaining were Carey Canada, Celotex, Fibreboard, and Pittsburgh Corning.[13] The jury found in answer to the first four questions when the defendants knew or should have known that their "asbestos-containing insulation products" posed a risk of asbestos-related disease to "insulators" (question 1), to their household members, to other "crafts working with or near insulation products," and to their household members. Pittsburgh Corning knew or should have known this since 1962 (when it first entered the business; it left it in 1972) as to both insulators and other crafts; the other three defendants since 1935 as to insulators and since 1955 as to other crafts; all four defendants as to both sets of household members since 1965. In answer to question 5, the jury found that, since 1962 as to Pittsburgh Corning and since 1935 as to the other defendants, the defendants' listed insulation products "were defective and unreasonably dangerous as a result of not

_____

more serious with continued occupational exposure. In some cases, this progression occurs even after exposure ceases." *Id*. at 545-50 (footnotes omitted).

[13]As noted, ACL's case was tried to the court.

12

having an adequate warning." The district court ultimately disregarded the answers to questions 2, 3, and 4, which addressed knowledge concerning other crafts and household members, and ordered judgment rendered on the basis of question 1, knowledge concerning insulators, and question 5, failure to warn. In question 7,[14] the jury found each defendant guilty of gross negligence warranting punitive damages and assigned a punitive damages multiplier of $3.00 per $1.00 of actual damages to Pittsburgh Corning, $2.00 to Celotex, and $1.50 each to Fibreboard and Carey Canada. Questions 8 through 17 separately addressed the individual case of each of the 10 class representatives. In each respective question, the jury was asked to find for the particular plaintiff or the defendants, and if for the plaintiff to find separate dollar amounts of past and of future damages for that plaintiff, and to "apportion causation" (in percentages totaling one hundred percent) among that plaintiff, some or all of the then current defendants, and some or all of the dismissed former defendants. In three of the cases, the plaintiff's causation was not submitted (in one of these the verdict was for the defendants, and a new trial was granted), in another three such causation was submitted but not found, and in four cases plaintiff causation was found (15%, 17%, 20%, and 50%). In each of the 9 cases in which the jury found for the plaintiff, Pittsburgh Corning's causation was fixed at 20%; Fibreboard and Celotex were each assessed 15% in 8 of these cases, and in one case Celotex was assessed 30% and

[14]Question 6 related only to Carey Canada.

13

Fibreboard none; in the only 4 of these cases in which Carey Canada's causation was submitted, it was found to be 15%. In each of these 9 cases, the causation of each of some 10 former defendants was submitted, separately for each, and it was found in each case in amounts ranging from as little as a total of 10% for all of them to as much as 50% for all. The jury's phase I actual damage findings totaled some $3.5 million.

*Phase III*

Following completion of the phase I trial (and a continuance), the district court proceeded directly into phase III, without any phase II trial. It was not until approximately seven weeks into the phase III trials that the stipulation—which ultimately replaced phase II—was entered into. It was clear from the beginning of, and throughout, the phase III trials that the two juries were not to, and did not, determine whether exposure to any of defendants' products was a cause of the sample plaintiffs' complained-of condition. In phase III the court instructed the jury that they were to assume exposure was sufficient to be a producing cause of all the disease categories. As plaintiffs admit in their brief here, in the phase III trial "the juries were told to assume that the claimants had sufficient exposure."[15] Indeed, for the most part evidence of exposure and its likely or possible results was not

---

[15]And, in hearings on post-trial motions below, the plaintiffs' counsel twice expressly agreed with the district court's assessment that the court's "instruction was that the jury was to assume exposure was sufficient to be a producing cause of all these diseases."

14

allowed.[16]  Simply stated, whether there was exposure to Pittsburgh

[16]The district court announced on more than one occasion at the beginning of the phase III trials, "[w]e are not going to try 160 cases of individual exposure."  Plaintiffs' counsel informed the district court post-trial—and defense counsel concurred—"[w]e were not allowed to litigate exposure during Phase 3.  When we tried the individual cases, we were not allowed to litigate exposure," and "we were prohibited in Phase 3 from proving exposure either to Pittsburgh Corning's products or exactly when the decades of exposure were or how much they were."  As the district court noted in one of its post-trial orders, "the parties did not litigate during the 'Phase Three' trials the duration and extent of exposure to asbestos by each of the 160 individual plaintiffs," and "[e]vidence quantifying how much exposure was not allowed in individual cases unless the issue of smoking was raised," and "the 'Phase Three' trials did not involve litigation of individual exposure, periods and duration."  Evidence of exposure was limited to lung cancer and certain other cancer cases where smoking was raised, essentially consisted of showing the number of years of asbestos exposure, and was not product or defendant specific.  At the beginning of the phase III trials, the court instructed the juries they would:

> "not hear evidence concerning which product they might have been exposed to or how much exposure they might have had.  Or which product they used more than others.
>
> For most of these cases, you may assume that there has been sufficient exposure to asbestos-containing insulation products for that exposure to be a producing cause of an asbestos-related injury or disease.
>
> Now, therefore, it will not be necessary for you to hear any evidence about the quantity or amount of exposure in most of these cases.  There is a category that I wish to address separately with you.
>
> It is not scientifically disputed that in lung cancer cases, there are two causes of lung cancer, of the types of lung cancer that we have that are the subject of claims in this case.  And those two causes are exposure to asbestos fibers and smoking.
>
> Therefore, I have ruled that it is appropriate for you to hear evidence on the lung cancer category of cases that relates to quantification of exposure.
>
> . . . .

You may assume that there was a sufficient exposure for

Corning's—or any other defendant's—asbestos, and, if so, whether that exposure was a cause of any of the 160 sample plaintiffs' illness, disease, or damages, was neither litigated nor determined in any of the phase III trials. Nor were any matters concerning any individual sample plaintiff's past connection with any particular worksite or craft either litigated or determined in phase III (although some miscellaneous information in this regard was not infrequently incidentally reflected in general background or work history testimony).

Following the phase III jury verdicts (including 12 zero verdicts) in the 160 sample cases, the district court ordered remittiturs in 35 of these cases ("34 of the pulmonary and pleural cases and in one mesothelioma case"), and calculated the average actual damage award, *after* remittitur (and considering the zero verdicts), in each disease category to be the following: mesothelioma, $1,224,333; lung cancer, $545,200; other cancer, $917,785; asbestosis, $543, 783; pleural disease, $558,900. These

---

that exposure to be a producing cause of an asbestos-related injury or disease on the damage question.

Now, you may very well have, as I told you -- I guess it was Tuesday -- a dispute about a diagnosis in some cases. And I am going to permit in those cases you to hear evidence about amounts of exposure compared, for example, to amounts of smoking, so you can decide one way or the other.

And you will hear evidence -- it is not disputed scientifically -- that for lung cancer cases, probably laryngeal cancer cases and maybe some other cases that fall in that category of, quote, "other cancers," that there's a synergistic effect between smoking and asbestos exposure."

16

were the figures to be applied to the extrapolation cases.

*Phase II stipulation*

We now turn to the written stipulation—entered into after some seven weeks of the phase III trials had taken place—which replaced phase II.  It was executed by all the plaintiffs and by Pittsburgh Corning, Fibreboard, and Celotex, who constituted all the then-remaining defendants (except ACL, whose case was non-jury), and was approved "so ordered" by the district court.

Attached to the stipulation as an exhibit was a special verdict form that would consist of separate interrogatories, each with a part (a) and a part (b), one each for each of the twenty-two worksites at issue.  For example, question 1(a) would ask "For Worksite No. 1, do you find that the following crafts had sufficient exposure to asbestos during the specified time periods to be a producing cause of the disease of asbestosis."[17]  The jury would answer yes or no separately as to each of over fifty listed crafts for each of four specified decades, namely 1942-52, 1952-62, 1962-72, and 1972-82.[18]  Question 1(b) would state, "For the crafts

[17]It appears undisputed that exposure sufficient to cause asbestosis is also sufficient to cause mesothelioma, lung cancer, and pleural plaques.

[18]The crafts were divided into four general groupings: "Production Crafts" (some thirteen in all, including e.g. pumper, gauger, and tube cleaner and various railyard crafts, including brakeman and engineer); "Maintenance Crafts" (eighteen, including boilermaker/steamfitter, insulator, machinist, brick mason, heavy equipment operator, and welder); "Shipyard" (thirteen, including rigger, ship fitter, laborer, electrician, carpenter, insulator, machinist, and pipefitter); and "GSU Powerhouses" (one of the twenty-two sites) (eleven, including operator, electrician, pipefitter, heavy equipment operator, and insulator).  Of the plaintiffs involved in this suit, only a very small minority were

17

and the time periods which were answered 'yes' in question 1(a), causation is apportioned as follows."  This question would be answered by stating separately for each listed craft a percentage applicable to each of the current defendants and each of the former defendants who had settled as to each of the same four decades (as to each decade the percentages were to total one hundred percent).[19] This process would be repeated, with questions 2(a) and 2(b), 3(a) and 3(b), and so forth, separately as to each of the remaining worksites.

The stipulation provides in part that:

"(3) It is stipulated that *some* individuals working in the listed crafts . . . at the 22 Phase Two worksites during each decade from 1942 to 1982 were exposed to asbestos during the course of their employment.  The exposure of *some* members of each of the crafts . . . at the 22 worksites was of sufficient length and intensity

---

insulators.

[19]Thus, for example, the verdict form would allow the jury to find in its answer to question 1(a) that at worksite No. 1 the production "craft" of "operator" had "sufficient exposure to asbestos to be a producing cause of the disease of asbestosis during" each of the 1962-72 and 1972-82 decades, but not during either the 1942-52 or the 1952-62 decades.  Again for example, the jury, assuming it had made the answers to question 1(a) hypothesized in the preceding sentence, would be able in answer to question 1(b) to apportion "causation" with respect to the production "craft" of "operator" at worksite No. 1 during the decade 1962-72, say twenty percent to Pittsburgh Corning, twenty percent to Fibreboard, fifteen percent to Celotex, and specific percentages (presumably including zero) severally to each of the former defendants who had settled, all such percentages to total one hundred percent for that particular decade; "causation" percentages with respect to the production "craft" of "operator" at worksite No. 1 would similarly be assigned to each current defendant and former defendant for the decade 1972-82, but such percentages could be different from those stated for them respectively for the 1962-1972 decade (or the percentages could remain the same as between the decades), and, again, the percentages would total one hundred percent.

18

to cause pulmonary asbestosis of varying degrees.

Asbestos-containing products of predecessors to the Celotex Corporation and Fibreboard Corporation were present during each decade in the specified worksites. An asbestos-containing product of Pittsburgh Corning Corporation was present during the decades 1962-1982 at the specified worksites.

The defendants do *not* stipulate that any members of the various crafts at the various worksites had the same exposure to any products *or* that any such individuals had the same susceptibility to asbestos-related diseases in the various crafts and worksites." (Emphasis added).

The stipulation further provides that, although "[i]f the Court were to proceed with 'Phase Two' . . . [i]t is stipulated for purpose of appellate review that the [phase II] jury's verdicts would assign different [causation] percentages to each" of the defendants Pittsburgh Corning, Fibreboard, and Celotex, and "would assign different percentages with respect to each Phase Two worksite . . . craft . . . and decade combinations" submitted, nevertheless "[defendants] stipulate it shall be deemed that the Phase Two jury" assigned in all instances the following comparative causation shares, *viz*: Pittsburgh Corning, ten percent; Fibreboard, ten percent; Celotex, ten percent; and Manville Personal Injury Settlement Trust, thirteen percent.[20] The court

---

[20]As Pittsburgh Corning did not produce or sell asbestos-containing insulation products before 1962, special provisions were made concerning it. "If an individual did not have exposure to asbestos after July 1, 1962, Pittsburgh Corning Corporation will be assessed no percentage responsibility." And, "[i]f the *Cimino* trial management plan is affirmed on appeal and . . . [the cited percentage provisions] become operative, the percentage to be applied to Pittsburgh Corning Corporation shall be reduced according to the following formula." This formula provided that in each individual plaintiff's case, Pittsburgh Corning's causation share would be the same fraction of ten percent as the number of the Pittsburgh Corning decades (1962-72; 1972-82) during which that

would use these stated percentages to fashion judgments in the 160 phase III sample cases and in the extrapolation cases.

Before setting out these percentages, however, the stipulation had made clear that defendants were not thereby agreeing that the trial plan—either the originally planned phase II or the contemplated extrapolation procedure—was a permissible way to adjudicate their liability and damages. Thus, it stated:

> "This stipulation relates to the percentage findings to be supplied through the Court's special verdict form which the Court intends to apply to individuals pursuant to the *Cimino* trial management plan, *to which these defendants object*. *If the reviewing courts reject* determination of individual legal causation issues by *resort to general Phase Two worksite/craft findings*, or reject the use of Rule 23 class trials for asbestos injury cases, the *Phase Two share percentage findings specified below are void*." (Emphasis added).

---

individual was exposed to asbestos was of the total number of the inquired-about decades (1942-52; 1952-62; 1962-72; 1972-82) during which that individual was exposed to asbestos. Thus, if an individual had been exposed to asbestos in each of the decades 1962-72 and 1972-82, but not in any other of the four decades, Pittsburgh Corning's causation share would be 10% (2/2 x 10); if the individual had been exposed to asbestos in each of the three decades 1952-62, 1962-72, and 1972-82, but not in the 1942-52 decade, Pittsburgh Corning's share would be 6 2/3% (2/3 x 10); if the individual was exposed in all four decades, Pittsburgh Corning's share would be 5% (2/4 x 10); if the individual was exposed in each of the decades 1942-52, 1952-62, and 1962-72, but not in the 1972-82 decade, Pittsburgh Corning's share would be 3 1/3% (1/3 x 10). The district court subsequently ruled that these decades were 1/1/1942 through 12/31/1951, 1/1/1952 through 12/31/1961, 1/1/1962 through 12/31/1971, and 1/1/1972 through 12/31/1982, and that exposure at any time during the decade sufficed, that is, for example, exposure from December 1, 1961, through January 31, 1972, but not thereafter, was exposure in each of the three decades ending 12/31/82. For these purposes, exposure to asbestos was not limited to exposure at one of the twenty-two worksites; thus one extrapolation plaintiff was judged to have been exposed during all four decades, although it is evident that the court found none of his exposure prior to 1964 was at any of those twenty-two sites.

Defendants' reservations of their objections in this respect are also reflected in later passages of the stipulation. In paragraph 5 it is stated that "Defendants continue to object to these extrapolation procedures," and paragraph 8 states:

> "Defendants reserve all rights to object to all past and future aspects of the *Cimino* trial plan and to assign as error all prior, present, and future rulings of the Court, except only that Defendants shall not assert that the evidence is or would be insufficient to support a 10% finding (as compared, e.g., to a 5% finding, etc.) with respect to any particular Phase Two jobsite and craft combination."

And, the stipulation recites that defendants specifically reserved, and would be afforded, the right to contend on appeal[21] the following (among other things):

> "that it is impermissible to determine medical or other causal responsibility on a jobsite or craft-wide basis; that it is impermissible to establish a single period of time sufficient to cause asbestos related disease, injury or harm except in connection with evidence presented in regard to an individual and as applied to that individual; that it is impermissible to use decades of exposure to asbestos, worksite or employment status to assess individual exposure or medical causation issues; and that it would be impermissible under governing law to assign a single percentage of 'causation' or 'responsibility' to a particular craft or job classification."[22]

---

[21]And to submit offers of proof to the district court concerning.

[22]The stipulation also says that "[i]t is understood by the Court, and it is agreed by the parties, that Defendants do intend to challenge all aspects of the *Cimino* trial management plan including all aspects of the Phase Two trial which would culminate in use of the special verdict form." Finally, paragraph 15 of the stipulation states:

> "The District Court is of the view, and the parties stipulate, that no appellate rights are prejudiced or waived by entering into this stipulation, and that no reviewing court should construe this stipulation as being

21

Paragraph 12 of the stipulation confirms its limited nature, *viz*:

> "(12) Without limitation, *Defendants do not stipulate that*: entry of any judgment based on actual or stipulated Phase Two findings is legally or factually sound; any Defendant in fact has legal responsibility to any individual plaintiff; *any individual plaintiff was in fact exposed to injurious quantities of asbestos from the products of any Defendant;* the products of any of the Defendants were in fact legal causes of injury to any individual plaintiff; or *that any issue framed by the Cimino pleadings can be adjudicated on a jobsite or craft-wide basis. Defendants have not stipulated or agreed that evidence to be received under the Cimino trial management plan is or could be sufficient to establish in these cases that any class member plaintiff suffers from an asbestos-related disease* (except as previously stipulated on the record in particular cases), *or that the asbestos-containing product or products of any defendant caused or contributed to any such disease, nor that a finding of* responsibility or *causation* in any percentage with respect to a defendant and any class member is or *could be sustained by evidence limited to asbestos-related disease among, or exposure to asbestos of, members of specified crafts at specified worksites over ten-year periods of time in the absence of* evidence sufficient to show that *each* plaintiff class *member* to *whom a defendant is held liable* in any percent himself or herself has an asbestos-related disease and that such class member *was exposed to the defendant's asbestos product or products in quantities and for times sufficient to cause such disease.* Further, defendants have not stipulated to the sufficiency of any evidence which would permit any finding by the Court or jury that any class member plaintiff has been damaged in any sum or amount by reference or resort to damages suffered by any other plaintiff, or groups of plaintiffs, in the absence of evidence specifically showing damage suffered by such plaintiff class member himself or herself individually." (Emphasis added).

Finally, the stipulation reflects that the court, by its

_____

> an agreement by the parties to any part of the *Cimino* trial management plan, or to the trials that have occurred as of the date of this stipulation, or to further implementation of *Cimino* procedures by the Court."

22

approval thereof, had ruled, and "would have adhered to such ruling throughout the trial" and "will adhere to this ruling in reviewing offers of proof" mentioned in the stipulation, that, with presently immaterial exceptions,

> ". . . it would not submit to the jury for a verdict (or receive individual evidence for individual adjudication) as to each plaintiff class member except where it has done so in proceedings to date, several issues, including: whether he or she was exposed to an asbestos-containing product; whether that exposure was sufficient to cause injury; the identity of those who manufactured the products to which such each plaintiff was exposed; and the individual damages suffered by such person as a result of exposure."

After the stipulation, the phase III trials continued for approximately five more weeks, conducted in all material respects on the same basis and in the same manner as they had been during the some seven weeks before the stipulation was entered into.

*Extrapolation*

The final phase was that of extrapolation. About a month after completion of the phase III trials, a one-day non-jury hearing was held in which the district court heard evidence concerning the degree to which the 160 sample cases were representative, in their respective disease categories, of the cases in the same disease category among the 2,128 extrapolation cases. Essentially the only evidence at this hearing was the testimony of three expert witnesses called by the plaintiffs, namely Dr. John Dement, Director, Office of Occupation Health and Technical Services, National Institute of Environmental Health Sciences; Professor Ronald Frankewitz of the University of Houston, a Ph.D. in Evaluation, Measurement, and Statistics; and University

23

of Texas Law School Professor of Trial Practice Patrick Hazel, an experienced personal injury trial lawyer.

The district court's opinion dealing with extrapolation does not refer, either generically or specifically, to any evidence other than Professor Frankewitz's testimony. He stated that he was furnished by someone in the offices of plaintiffs' counsel computerized written data reflecting, as to each of the 160 sample cases and each of the 2,128 extrapolation cases, whether the case was a sample case or an extrapolation case, which of the 5 disease categories the case involved, and an answer to each of 12 specific variables pertaining to the particular plaintiff or plaintiff's decedent alleged injury to whom formed the basis of the suit. The 12 variable were gender, race, whether living, whether ever smoked, whether was a wage earner (when not specified), age, first year of exposure, last year of exposure, total years of exposure, latency, pack years smoked, trade and predominant craft. Professor Frankewitz testified that the sample cases in each of the five disease categories were representative of the extrapolation cases in the same disease category "in terms of the variables that I've analyzed," so that, for example, if one were to randomly select another 50 asbestosis cases from the 2,128 extrapolation cases, 99 out of 100 times (98 out of 100 in two minor respects) those 50 cases would have "the same mix of variables" as the 50 asbestosis cases which were a part of the 160 sample phase III cases.[23] Dr.

_____

[23]Professor Frankewitz had no information as to any of the verdicts in any of the phase III sample cases, "made no attempt . . . to correlate or to identify any results or factors . . . that

24

Frankewitz did not select the variables, nor did he determine what those variables were in any of the cases; rather he was simply furnished that information by plaintiffs' counsel's office. Similarly, he made no independent judgment as to which disease category any case fit in, but simply was furnished that conclusion by the office of plaintiffs' attorneys. And Dr. Frankewitz was even not sure just what some of the variables meant. When asked what the variable "total years of exposure" meant, he repled "As far as I'm concerned, I believe it's . . . I'd be guessing. I would say it's the number of years that an individual was exposed to asbestos in a particular setting, particular situation" (earlier in his testimony he had indicated that it was "a function of" first and last years of exposure). He did not calculate "total years of exposure" and when asked who did, said "My belief would be it would be a clerk under the supervision or direction of one of the plaintiffs' attorneys."[24] The district court concluded "that the distribution of variables between the samples and their respective

---

would predict or estimate what jury awards might be," and stated that "none of what I have done . . . related to magnitude of verdicts."

[24]Similarly, when asked "what criteria were used to determined who was a wage earner," Dr. Frankewitz replied "Again, this was information that was encoded and afforded to me." When asked whether the wage earner variable "is equivalent in some fashion to whether or not a wage-lost claim was asserted," he responded "I don't know what we're talking about there. I have no knowledge of that terminology. I'm operating on the basis of merely a categorical variable, sir, whether a person was classified as a wage earner or not."

subclasses is comparable."[25]

[25]Defendants unsuccessfully objected to Professor Frankewitz's testimony on the basis that his testimony as to the presence and distribution of the different variables depended entirely on what he was told by employees of plaintiffs' attorneys.  In an effort to respond to this, and to a similar unsuccessful objection to Dr. Dement's testimony, plaintiffs, well after the extrapolation hearing and the orders initially entered on the basis thereof, moved to place of record the answers of all class members to Fibreboard and Master interrogatories, which they asserted were the ultimate source of the "variables" and disease data furnished Frankewitz and Dement.  The district court denied the motion, stating that these answers "were neither offered nor admitted into evidence at trial.  Fed. R. Civ. P. 33 requires a formal offer of answers to interrogatories at trial.  *Jones v. Diamond*, 519 F.2d 1090, 1098 and n.13 (5th Cir. 1975); 4A *Moore's Federal Practice* § 33.29(1.-2)."  The plaintiffs' interrogatory answers are not in the record before us.  Apparently for the same reason (and also in reference to prejudgment interest), plaintiffs also filed (well after the extrapolation hearing) a motion and supplemental motion to take judicial notice of the years of last exposure of each plaintiff (relying on their referenced interrogatory answers).  The district court likewise denied those motions.

Dr. Dement concluded that from an epidemiological point of view the distribution of certain important "risk factors" in each disease category in the 160 phase III sample cases was very comparable to or representative of the distribution of those same factors in the like disease category cases among the extrapolation cases.  The "factors" were age, race, sex, whether or not the individual ever smoked (at least in some disease categories), the year of first exposure (year of last exposure was not considered), and the length of time from first exposure to the initial diagnosis (latency period).  A final factor was to characterize the individual's "predominant work site" (site of longest employment) as having been in one of six different generic types, namely "refinery, chemical plant, shipyards, construction and trades, household exposure, and a group sort of catch-all other."  This factor also asked as to each of these six generic types of work sites whether the individual had or had not *ever* worked at such a site.  Concerning the some 2,128 extrapolation cases, Dr. Dement was furnished by personnel in the office of plaintiffs' counsel the answer as to each individual to each of the above "factors" as well as the appropriate disease category for that individual.  Dr. Dement did not make any review of any of those 2,128 cases and relied entirely on the referenced answers furnished by the office of plaintiffs' counsel.  He did state that whether or not an individual was exposed to asbestos at a work site was *not* a criteria in determining the individual's "predominant work site" and "we have no exposure information, to my knowledge, or very little at most of these work sites."  However, in general

26

refineries, chemical plants, and shipyards were a source of asbestos exposure. Dr. Dement acknowledged that since 1970 there was likely some decrease in industrial asbestos exposure, but that in some instances "there was some deterioration in plant operational maintenance conditions that would cause increases." He also stated that "it [the 2,128 cases] is of a very mixed work history population. Many of these individuals worked in many, many different places." Dr. Dement likewise acknowledged that his "analysis was strictly the risk factors for the disease not in the level of any disability," and that the risk factors simply related to "increased risk and you cannot predict on any individual basis whether or not . . . he's going to develop lung cancer or asbestosis or not."

Professor Hazel testified that in personal injury cases generally (he had never had an asbestos case) the main factors important to evaluation for settlement purposes were the potential for liability for actual or punitive damages, the extent of the plaintiff's injury, the venue or forum (the particular jury selected if settled at that stage), the quality of the opposite party's legal representation, the defendant's ability to pay, and "the host of other factors I would call the plaintiff's characteristics . . . what is the appearance this plaintiff is likely to make? What kind of presentation in front of the jury is this plaintiff likely to make?" Professor Hazel looked at the verdicts in the 160 sample phase III cases and also at some of the evidence in some of those cases; he did not do any review of any of the extrapolation cases. He received information from some of the plaintiffs' lawyers regarding what they thought were "pluses" and "minuses" in their sample phase III cases, and stated that smoking was a reported negative, as was age in some instances and "whether the jury won't like him or her"; while no one had had "ten years" in prison, there were instances counsel "said here's something we know but the other side doesn't know." Most of the things plaintiffs' counsel reported "as the positives and the negatives" would fit into Hazel's classification of "plaintiff's characteristics." Reviewing memos from defense counsel concerning possible settlement of these cases, Hazel noted (over defense objections) that they mentioned disease classifications, smoking (in lung cancer cases only), whether or not over age 60 (or 65), and what Hazel assumed was job impairment; other than smoking they did not "appear to consider . . . the individual characteristics of any Plaintiff." In reviewing the verdicts rendered in the phase III cases, Hazel "was struck" by the difference in verdicts as between the two different juries that tried those cases. Hazel recognized that attorneys generally value pleural cases with "the lowest evaluation" of all asbestos-related disease classifications, and noticed this pattern had *not* been followed in the phase III verdicts, but had no explanation for that. Indeed, the average phase III pleural verdict *exceeded both* the average asbestosis and the average lung cancer verdict by more than $10,000 (after

27

2. Analysis

As noted, Pittsburgh Corning attacks the *Cimino* trial plan, as it did at all times below, principally on the basis that it fails to properly try and determine individual causation, and in the extrapolation cases also fails to properly try and determine individual damages, as to any plaintiffs other than the ten class representatives whose individual cases were fully tried in phase I. Pittsburgh Corning asserts in this connection, among other things, that these aspects of the trial plan are contrary to *Fibreboard*, impose liability and damages where they would not be imposed under Texas substantive law, and invade its Seventh Amendment and due process rights. Although we do not separately address the due process contention as such, we conclude that the *Cimino* trial plan is invalid in these respects, necessitating reversal of all the phase III sample case judgments as well as the five extrapolation case judgments before us.[26]

---

remittitur and including zero verdicts). Hazel had no information on the range of injury involved in the phase III pleural cases; nor had he ever before seen or studied a situation where one particular jury repeatedly returned separate verdicts in a long series of cases.

[26]At approximately the conclusion of the phase I trial, and well before phrase III began, a motions panel of this Court issued an order denying a petition for writ of mandamus filed by Fibreboard challenging the trial plan. The order was without opinion (it merely recited "It is ordered that the petition for writ of mandamus is denied"). It is settled that the motions panel order is not binding on us. *See, e.g., Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 704 (5th Cir. 1997), *cert. denied*, 118 S.Ct. 336 (1997); *Browning v. Navarro*, 887 F.2d 553, 557 (5th Cir. 1989),

28

We begin by stating some very basic propositions. These personal injury tort actions for monetary damages are "a prototypical example of an action at law, to which the Seventh Amendment applies." *Wooddell v. Intern. Broth. of Elec. Workers*, 112 S.Ct. 494, 498 (1991). The Seventh Amendment applies notwithstanding that these are diversity cases. *Simler v. Conner*, 83 S.Ct. 609 (1963). *See also Gasperini v. Center for Humanities, Inc.*, 116 S.Ct. 2211 (1996). But because these are diversity cases, the Rules of Decision Act, 28 U.S.C. § 1652, and *Erie R. Co. v. Tompkins*, 58 S.Ct. 817, 822-23 (1938), with its seeming constitutional underpinning, mandate that the substantive law applied be that of the relevant state, here Texas. Substantive law includes not only the factual elements which must be found to impose liability and fix damages, but also the burdens of going forward with evidence and of persuasion thereon. *Palmer v. Hoffman*, 63 S.Ct. 477, 482 (1943); *Cities Service Oil Co. v. Dunlap*, 60 S.Ct. 201 (1939).

None of the foregoing is or can be altered by the utilization of Fed. R. Civ. P. 23(b)(3) or Fed. R. Civ. P. 42(a). As to the Seventh Amendment, the Court in *Ross v. Bernhard*, 90 S.Ct. 733 (1970), held that in a stockholders' derivative action seeking monetary relief—now provided for in Fed. R. Civ. P. 23.1—although the right of the stockholders to sue on behalf of the corporation was an equitable matter determinable by the court, the monetary

---

*reh'g denied*, 894 F.2d 99 (5th Cir. 1990); *Northshore Development Co. v. Lee*, 835 F.2d 580, 583 (5th Cir. 1988) ("a motions panel decision is not binding precedent").

claims of the corporation against the defendants were legal claims to which the Seventh Amendment applied. The Court observed that "The Seventh Amendment question depends on the nature of the issue to be tried rather than the character of the overall action," *id*. at 738, and "nothing turns now upon the form of the action or the procedural devices by which the parties happen to come before the court." *Id*. at 739. It also noted that it was "inclined to agree with the description" of derivative suits "as one kind of 'true' class action," and that "it now seems settled in the lower federal courts that class action plaintiffs may obtain a jury trial on any legal issues they present." *Id*. A leading text gives the following commentary on *Ross*:

> "The language just quoted, that nothing turns on 'the procedural devices by which the parties happen to come before the court,' makes the Ross case controlling not only for derivative actions but also for the other procedural devices that the Civil Rules borrowed from equity. In all of these it will be for the judge to decide whether the device may be used, but once he or she does so there will be a right to jury trial on any of the underlying issues that are legal in nature. Indeed, the Ross decision itself relied in part on lower court decisions reaching this result with regard to class actions under Rule 23. The Court said that 'it now seems settled in the lower federal courts that class action plaintiffs may obtain a jury trial on any legal issues they present,' and indicated its agreement with the view that derivative suits are one kind of 'true' class action." 9 Wright & Miller, *Federal Practice and Procedure*, § 2307 at 79 (footnotes omitted).[27]

_____

[27] Indeed, the instant case is clearly *a fortiori* of *Ross*. In *Ross*, the Court was dealing with an action—a stockholders' derivative suit—which was historically equitable and which was fairly described as a "true" class action. Here we are dealing with tort personal injury damage suits, historically the quintessential legal action for Seventh Amendment purposes, and with a Rule 23(b)(3) class action which, at least in the personal injury damage suit context, has no equitable antecedents and is not

30

And, this Court has long held that the applicability of the Seventh Amendment is not altered simply because the case is Rule 23(b)(3) class action. *State of Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 318 (5th Cir. 1978).[28]

Similarly, use of Rule 23(b)(3) or 42(a) does not alter the required elements which must be found to impose liability and fix damages (or the burden of proof thereon) or the identity of the substantive law—here that of Texas—which determines such elements. We squarely so held in *Fibreboard*. And the rules enabling act, 28 U.S.C. § 2072 likewise mandates that conclusion.[29] As we said in *Blue Bird Body Co.*:

> "This Circuit has also explained that the meaning of liability for antitrust purposes does not change simply because a trial is bifurcated under Fed. R. Civ. P.

---

a "true" but rather a "spurious" class action.

We also observe that the passing reference in *Ross*'s footnote 10 to "the practical abilities and limitations of juries" has been explained by the Court as referring to one of the criteria to be used in assessing, under the "public rights" doctrine, "whether Congress has permissibly entrusted the resolution of certain disputes to an administrative agency or specialized court of equity, and whether jury trials would impair the functioning of the legislative scheme." *Granfinanciera, S.A. v. Nordberg*, 109 S.Ct. 2782, 2790 n.4 (1989). *See also* Wright, *Law of Federal Courts* (5th ed.), § 92 at 658-59.

[28]Further, Fed. R. Civ. P. 38(a) provides that: "The right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States shall be preserved to the parties inviolate." The original advisory committee notes reflect that: "This rule provides for the preservation of the constitutional right of trial by jury as directed in the enabling act . . . ." *See also* Fed. R. Civ. P. 42(b) (". . . always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States").

[29]As do also *Erie* and the Rules of Decision Act in diversity cases.

42(b).  In *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307 (5th Cir. 1976), this court stated that there was 'no basis in law or logic to give liability different meanings depending upon the trial procedure used.'  *Id*. at 1321.  The *Leasco* opinion explained that bifurcation in no way diminishes the requirement that a plaintiff show some evidence that a violation caused him injury before a defendant is found liable.

.  .  .  .

    Just as *the meaning of liability* does not vary because a trial is bifurcated, the requisite proof also *in no way hinges upon whether or not the action is brought on behalf of a class under Rule 23*.  It is axiomatic that a procedural rule cannot 'abridge, enlarge, or modify any substantive right.'  [citing 28 U.S.C. § 2072]  Consequently, *this court has no power to define differently the substantive right of individual plaintiffs as compared to class plaintiffs*."  *Id*. at 317–318 (footnote omitted; emphasis added).[30]

---

[30]*See also id*. at 327:

    "The holding in *Shumate* [*Shumate & Co. v. Ntl. Ass'n*, 509 F.2d 147 (5th Cir. 1975)] affirming the district court's denial of a class certification is a recognition by this court that the fact that a case is proceeding as a class action does not in any way alter the substantive proof required to prove up a claim for relief.  The holding is also a recognition that 'impact' is a question unique to each particular plaintiff . . . ."

Similarly, the en banc Fourth Circuit stated in the anti-trust class action case of *Windham v. American Brands, Inc*., 565 F.2d 59, 66 (4th Cir. 1977)—which we cited with approval in *Blue Bird Body Co*., n.20—as follows:

"While a case may present a common question of violation, the issues of injury and damage remain the critical issues in such a case and are always strictly individualized.

.  .  .  .

Generalized or class-wide proof of damages in a private anti-trust action would, in addition, contravene the mandate of the Rules Enabling Act that the Rules of Civil Procedure 'shall not abridge, enlarge or modify any

32

Nor is deviation from these settled principles authorized because these are asbestos cases whose vast numbers swamp the courts. *Fibreboard* clearly so holds. So, also, in *Jackson v. Johns-Manville Sales Corp.*, 750 F.2d 1314 (5th Cir. 1985), *cert. denied*, 106 S.Ct. 3339 (1986), a diversity asbestos case arising in Mississippi, we declined to adopt a federal common law rule for asbestos cases (or to certify to the United States Supreme Court whether to do so), stating:

> ". . . [U]nder our federal system Congress is generally the body responsible for balancing competing interests and setting national policy. There is no doubt that a desperate need exists for federal legislation in the field of asbestos litigation. Congress' silence on the matter, however, hardly authorizes the federal judiciary to assume for itself the responsibility for formulating what essentially are legislative solutions. Displacement of state law is primarily a decision for Congress, and Congress has yet to act. . . ." *Id*. at 1327.

When, after *Fibreboard*, the district court adopted the present trial plan, it initially justified doing so on the basis of its conclusion that "the Texas Supreme Court, if faced with the facts of this case, would apply a collective liability theory, such as the Court's plan, to an asbestos consolidated action."[31] The court based this conclusion on a passage in *Gaulding v. Celotex Corp.*, 772 S.W.2d 66, 71 (Tex. 1989), stating "We are not to be construed

substantive right.'" (Footnotes omitted).

[31]As previously observed, after *Fibreboard* the district court at first determined to follow the *Jenkins* multiple mini-trials format (see note 8, *supra*), but some months later changed its mind and devised the present plan; the quoted language comes from the latter opinion-order. It may also be noted that in its final published opinion in this matter, *Cimino*, 751 F.Supp. 649, the district court does not again advert to the idea that Texas would apply some sort of collective liability theory.

as approving or disapproving alternative liability, concert of action, enterprise liability, or market share liability in an appropriate case." We are compelled to reject the district court's conclusion for each of several independently sufficient reasons. To begin with, it is contrary to *Fibreboard*, which plainly holds that under Texas substantive law causation of plaintiff's injury by defendant's product and plaintiff's resultant damages must be determined as to "individuals, not groups."[32] *Fibreboard*'s determination of Texas law is precedent which binds this panel. *See, e.g., F.D.I.C v. Abraham*, 137 F.3d 264, 268-69 (5th Cir. 1998); *Broussard v. Southern Pacific Transportation Company*, 665 F.2d 1387, 1389 (5th Cir. 1982) (en banc). *Gaulding* furnishes no basis to depart form *Fibreboard* because it was quoted and relied on

---

[32]Thus, we held in *Fibreboard*:

> "Texas has made its policy choices in defining the duty owed by manufacturers and suppliers of products to consumers. These choices are reflected in *the requirement that a plaintiff prove both causation and damage*. In Texas, it is a 'fundamental principle of traditional products liability law . . . that the plaintiffs must prove that the defendant supplied the product which caused the injury.' [citing *Gaulding*] *These elements focus upon individuals, not groups*. The same may be said, and with even greater confidence, of wage losses, pain and suffering, and other elements of compensation." *Id*. at 711 (footnotes omitted; emphasis added).

*See also id*. at 711-712, invalidating procedure because it "cannot focus upon such issues as individual causation, but ultimately must accept general causation as sufficient, contrary to Texas law" and "it does not allow proof that a particular defendant's asbestos 'really' caused a particular plaintiff's disease; the only 'fact' that can be proved is that *in most cases* the defendant's asbestos *would have been* the cause." *Id*. at 712 (footnote omitted; original emphasis).

therein. *Fibreboard* at 711, n.4. No Texas appellate decision or statute subsequent to *Fibreboard* casts doubt on the correctness of its reading of Texas law. In the second place, even were we not bound by *Fibreboard* we would reach the same conclusion it did, namely that under Texas personal injury products liability law causation and damages are determined respecting plaintiffs as "individuals, not groups." We know of no Texas appellate decision which in that or a similar context has even approved of in dicta, much less adopted, the theories of "alternative liability, concert of action, enterprise liability, or market share liability" which *Gaulding* states it was not "approving or disapproving." *Id*. at 71. "We have long followed the principle that we will not create 'innovative theories of recovery or defense' under local law, but will rather merely apply it 'as it currently exists.'" *Johnson v. Sawyer*, 47 F.3d 716, 726 (5th Cir. 1995) (en banc) (citations omitted). Consistent with that principle, we have on more than one occasion expressly refused to hold that Louisiana would apply a market share liability theory to asbestos personal injury claims, where no Louisiana appellate decision had either done so or declined to do so. *Thompson v. Johns-Manville Sales Corp.*, 714 F.2d 581, 583 (5th Cir. 1983) (refusing to hold that Louisiana would adopt either "enterprise" or "market share" liability; noting "[b]oth theories represent radical departures from traditional theories of tort liability" and "[s]uch departures are for the Louisiana courts, not for us"); *Bateman v. Johns-Manville Sales Corp.*, 781 F.2d 1132, 1133 (5th Cir. 1986) (market share

35

liability).  *See also Jefferson v. Lead Industries Ass'n, Inc*., 106

F.3d 1245 (5th Cir. 1997) (declining to adopt market share

liability in Louisiana diversity suit for lead paint poisoning);

*Rhynes v. Branick Mfg. Co*., 629 F.2d 409 (5th Cir. 1980) (declining

to adopt "product line" liability theory in Texas diversity case).[33]

We apply Texas law as it currently exits, which is correctly stated

in *Fibreboard*.[34]  Finally, it is clear that this case was neither

tried nor determined on any of "the collective liability theories"

mentioned in *Gaulding*.  *See id*. at 71.[35]

---

[33]In *Thompson*, *Bateman,* and *Jefferson*, we also declined to
certify the issue to the Louisiana Supreme Court.  *Rhynes* does not
mention certification.

[34]We also note that in *Gaulding* the Texas Supreme Court
observed concerning the "concert of action" theory that "[m]ost
jurisdictions that have considered this theory have rejected its
application to latent disease product liability cases which involve
numerous manufacturers," *id*. at 69, and concerning the "enterprise
liability" theory that it "has been rejected by virtually all other
jurisdictions [apart from the Eastern District of New York] that
have considered this concept." *Id*. at 70.  The *Restatement Third,
Torts:  Products Liability* expressly declines to take a position on
market share liability. *Id*. § 15, comment <u>c</u>.  The reporter's notes
to this section state that "[a] substantial number of courts have
rejected the market-share approach."

[35]For example, there was no finding on any defendant's market
share.  Moreover, joint and several liability were imposed, which
*Restatement Third, Torts:  Products Liability* § 15, comment <u>c</u>
indicates would be improper if such approach were used (". . . if
a court does adopt some form of proportional liability, the
liability of each defendant is properly limited to the individual
defendant's share of the market.  The rules of joint and several
liability are incompatible with a market-share approach to
causation").  As to "concert of action," there was no finding of
any concert.  As to "enterprise liability," there was no finding
that "the risks inherent in asbestos . . . products were jointly
controlled by the defendants." *Gaulding* at 70.  "Alternative
liability" is plainly inapplicable here as it applies only where
"acts of negligence are *simultaneously* committed by two or more
tortfeasors and *only one* act results in injury . . . [w]hen a
plaintiff fails to join all possible defendants, alternative does

Thus, the question becomes: did the implemented trial plan include a litigated determination, consistent with the Seventh Amendment, of the Texas-law mandated issues of whether, as to each individual plaintiff, Pittsburgh Corning's product was a cause of his complained-of condition and, if so, the damages that plaintiff suffered as a result.

We turn first to the phase III plaintiffs. In these cases, the trial plan was adequately individualized and preserved Seventh Amendment rights with respect to each individual's actual damages from an asbestos-related disease. However, it was not designed or intended to, and did not, provide any trial or any determination of whether a Pittsburgh Corning product was a cause of that disease.[36] It was strictly a damages trial as to those individual plaintiffs. The stipulation—not entered into until midway through phase III—established merely that "some" individuals working in each of the listed crafts, "during" each of the four decades 1942-1982 and

---

not apply." *Id*. at 69 (emphasis added). *See also In Re Benedectin Litigation*, 857 F.2d 290, 312 (3d Cir. 1988), *cert. denied*, 488 U.S. 1006 (1989) (applicable "only when two or more defendants have been at fault, and one and only one caused the injury"); *Restatement Second, Torts* § 433 B comment h, which states that cases applying the doctrine "all have been cases in which all of the actors involved have been joined as defendants. All of these cases have involved conduct simultaneous in time, or substantially so, . . . ." Here these factors are not met: the wrongful conduct of the defendants was not simultaneous or substantially so (e.g., Fibreboard produced and sold asbestos products to which many plaintiffs were allegedly exposed decades before Pittsburgh Corning entered the business); the conduct of several parties, not only one, allegedly caused the complained of injuries; and it is not shown that all manufacturers of asbestos products to which all plaintiffs were exposed were joined.

[36]Nor was there any summary judgment, or judgment under Fed. R. Civ. P. 50, rendered on that issue.

at each of the twenty-two worksites, "were exposed to asbestos" with "sufficient length and intensity to cause pulmonary asbestosis of varying degrees" and that "an asbestos-containing product of Pittsburgh Corning Corporation was present during the decades 1962–1982 at the specified worksites."  It was *expressly not* stipulated "that any members of the various crafts at the various worksites had the same exposure to any products," *or* "that any such individuals had the same susceptibility to asbestos-related diseases in the various crafts and worksites," *or* that "any individual plaintiff was in fact exposed to injurious quantities of asbestos from the products of any defendant."  Phase III did not litigate or determine whether or to what extent any of the one hundred sixty individual plaintiffs was exposed to Pittsburgh Corning's—or any other defendant's—asbestos, or was exposed to asbestos at any of the twenty-two worksites, or whether any such exposure was in fact a cause of that plaintiff's illness or disease.  Nor did phase III litigate or determine either any individual plaintiff's past connection with any particular worksite or craft, or whether or to what extent such individual was exposed to asbestos otherwise than at any of the specified worksites.[37]

---

[37]Incidental general background and work history testimony as to many of these one hundred sixty plaintiffs reflects claimed extensive asbestos exposure at many locations other than the twenty-two worksites, both within the general southeast Texas area, elsewhere in the state, and at numerous locations in other states (none of which were claimed to contain Pittsburgh Corning asbestos), as well as lengthy exposure prior to 1962, and even prior to 1942.  For example, one phase III plaintiff's exposure apparently commenced before 1933; another was first exposed in Oregon in 1942, later moved to Texas doing construction work "at different locations around Texas," and began experiencing weakness

Indeed, for the most part exposure evidence was not allowed and the jury was instructed to assume sufficient exposure. Nor did phase III either litigate or determine whether or to what extent asbestos exposure, either generally or to the product of any particular defendant, was uniform or similar for members of any given craft at any one or more of the specified worksites.

We note that at least two of the twenty-two sites actually each involved two plants, and another involved "the facilities" of a company "including" its powerhouse. Further, Pittsburgh Corning tendered evidence[38] that a typical refinery covers several square miles and indicating that at refineries, shipyards, and other installations asbestos exposure levels were not uniform at the site or throughout a craft or within a decade or between decades, and that most individuals employed at the twenty-two worksites did not have sufficient exposure to cause asbestosis. Also so tendered was evidence indicating that exposure to asbestos below some level would not produce asbestosis and even above that level risks remain

---

and shortness of breath sometime between 1965 and 1975; and another "since about 1957" had "worked primarily as a plumber and pipe fitter in the Waco area" during which he applied and removed asbestos products. Another's working career commenced in 1961 at an ammunition plant in Tyler, Texas, where he remained (except for some two years running a small store) until 1977 or 1978 and was exposed to asbestos there; thereafter and until 1989 he worked in construction at various jobs around Texas, including at Mount Pleasant and in paper mills, and in at least eight other states, and was exposed to asbestos; in "the early '80's" he began to feel weaker; in 1986 he was diagnosed with asbestosis; and in 1989 he returned to work at the Tyler ammunition plant where he remained employed at trial.

[38]The stipulation reserved it the right to do so and reflects that the district court would adhere to its trial plan notwithstanding any such tenders.

very low until a multiple of five or ten or twenty times the threshold level is reached;[39] that not all those exposed to asbestos in substantial quantities and for protracted periods of time develop asbestosis; that asbestosis develops in "a relatively small percentage of patients with significant asbestos exposure"; and, that although there is a dose response relationship—the more exposure the more risk, the less, the less risk—respecting asbestosis, nevertheless the effect of the same exposure is not the same as between different individuals and "two similarly exposed asbestos workers with exactly the same asbestos historical exposure can go on to have in one case asbestosis and the other case no lung problems."  Moreover, we have held, in a Texas law diversity case, that "the appropriate test for a [plaintiff's] *minimum* showing of producing cause in asbestos cases" is that stated in *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir. 1986), namely the "'frequency-regularity-proximity' test" under which "a motion for summary judgment cannot be defeated merely by alleging work at a shipyard in which defendants' asbestos products had somewhere been present.  Rather, there must be proof of frequent and regular work

_____

[39]Also, that lung cancer, in addition to being caused by smoking and asbestos exposure, can be caused by exposure to radiation, chromium, arsenic, and polynuclear aromatic hydrocarbons, and that exposure to such known causes of lung cancer "are very frequent in both shipyards and the petrochemical industry"; that because of the long latency of asbestos-related lung cancer—generally 25 to 30 years, sometimes as short as 10 to 15 years—"if an individual were exposed to asbestos only a few years prior to the diagnosis of lung cancer, that asbestos would not be able to be incriminated" (and "exposures occurring 15 years prior to diagnosis of lung cancer are not going to be as important as exposures 30 or 35 years prior to diagnosis of lung cancer in terms of being causally related").

40

in an area of the shipyard in proximity to some specific item of defendants' asbestos containing product." *Slaughter* v. *Southern Talc. Co., 949 F.2d 167, 171 (5th Cir. 1991) (emphasis added)*.[40] It is important to note that this is merely a *minimum* showing; *Slaughter* makes clear that making such a showing *merely* gets a plaintiff *to* the jury, it does not entitled him to judgment as a matter of law. *See id*. at 173. Further, it is obvious that for these purposes a shipyard is not considered as a single, undifferentiated, and uniform mass.

We have noted that the district court, in the order in which it initially adopted the present plan, stated that for purposes of the then-contemplated phase II trial it would "make a non-jury determination as to which Plaintiffs or Plaintiffs' decedents worked for a sufficient period of time at each worksite so as to be a proper member of that worksite's group and which Plaintiffs were proper members of each of the crafts at these worksites. . . ." As previously observed, after phase I the case proceeded directly into phase III without any phase II, and the stipulation was not entered into until phase III was half complete. It is not clear that the district court ever determined that any (or, if so, which) of the tried one hundred sixty phase III plaintiffs, or that any (or if so, which) of the unsevered extrapolation plaintiffs, actually did work at the worksites "for a sufficient period of time" to be "proper members of each of the crafts at these worksites." And, if

---

[40]*Slaughter* also observed that this test had been adopted by all but three circuit courts and by some eight states. *Id*. at 171 n.3.

41

such determinations were made, it is not clear what criteria were employed and what source or sources of information were utilized either in selecting or in applying the criteria. In any event, it *is* clear not only that any such determination was made non-jury, but further that it was made without either any evidentiary (or other) hearing or any summary judgment procedure (or Fed. R. Civ. P. 50 motion). Accordingly, no such determination can serve to justify or sustain the trial plan as implemented.

With one exception, noted below, we are aware of no appellate decision approving such a group, rather than individual, determination of cause in a damage suit for personal injuries to individuals at widely different times and places. For example, in a personal injury suit by individuals living in the neighborhood of a landfill allegedly contaminated by defendant, the Sixth Circuit remarked:

> "Thus, the court, as is appropriate in this type of mass tort class action litigation, divided its causation analysis into two parts. It was first established that Velsicol was responsible for the contamination and that the particular contaminants were *capable* of producing injuries of the types allegedly suffered by the plaintiffs. Up to this point in the proceeding, the five representative plaintiffs were acting primarily in their representative capacity to the class as a whole. This enabled the court the determine a kind of generic causation—whether the combination of the chemical contaminants and the plaintiffs' exposure to them had the capacity to cause the harm alleged. This still left the matter of *individual* proximate cause to be determined. Although such generic and individual causation may appear to be inextricably intertwined, the procedural device of the class action permitted the court initially to assess the defendant's potential liability for its conduct without regard to the individual components of each plaintiff's injuries. However, from this point forward, it became the responsibility of each individual plaintiff to show that his or her specific injuries or damages were

42

proximately caused by ingestion or otherwise using the contaminated water." *Sterling v. Velsicol Chemical Co.*, 855 F.2d 1188, 1200 (6th Cir. 1988).[41]

*See also In Re Agent Orange Product Liability Litigation*, 818 F.2d 145 (2d Cir. 1987), *cert. denied*, 108 S.Ct. 695 (1988) (in appeal from settlement in Rule 23(b)(3) class action for agent orange exposure, in which general liability issues, including the military contractor defense, were to be tried class-wide and individual issues, such as each individual's damages caused by exposure, "were to be left to individual trials," *id*. at 150, 164, the court holds certification proper *only* because of "the centrality of the military contractor defense" and that certification "would have been error" in an action by civilians for exposure during civilian affairs, noting "[t]he relevant question . . . is not whether Agent Orange has the capacity to cause harm, the generic causation issue, but whether it *did* cause harm and to whom. That determination is highly individualistic, and depends upon the characteristics of individual plaintiffs (e.g., state of health, lifestyle) and the nature of their exposure to Agent Orange . . .," *id*. at 165-166).[42]

---

[41]This was a bench trial case, no jury apparently having been demanded, in which a Rule 23(b)(3) class was certified, and a trial held in which defendant's culpability for contaminating the landfill and area water supply with chemicals generically capable of causing the injuries sued for was determined along with punitive damages and the entire claims of the five class representatives. Deferred for later "individual hearings" were "the issues of causation and injury of" each of the other class members. *Id*. at 1194.

[42]*Cf. Valentino v. Carter-Wallace, Inc*., 97 F.3d 1227, 1229, 1234 (9th Cir. 1996) (in certifying Rule 23(b)(3) class in prescription drug products liability suit, district court "specifically excluded the individual issues of proximate causation, compensatory damages"; class certification reversed

43

The district court also justified its trial plan by reliance on *Pettway v. American Cast Iron Pipe Co*., 494 F.2d 211, 258-63 (5th Cir. 1974), where, in a Title VII Rule 23(b)(2) class action, we stated that back pay could be awarded on a class-wide basis, using average rates of pay and approximations, and did not require an individual plaintiff by individual plaintiff approach. However, *Pettway* is inapplicable here, for each of several reasons. In the first place, Title VII actions are entirely equitable actions[43] and back pay awards therein are strictly equitable remedies, as we recognized in *Pettway* ("the award of back pay" is "one element of the equitable remedy," *id*. at 1125), and as we have held in other decisions both before and after *Pettway*. *Johnson v. Georgia Highway Express, Inc*., 417 F.2d 1122, 1125 (5th Cir. 1969) (no entitlement to a jury in Title VII action seeking back pay as that is "an integral part of the statutory equitable remedy, to be determined through the exercise of the court's discretion, and not by a jury"); *Wilson v. Belmont Homes*, 970 F.2d 53, 54-56 (5th Cir.

---

because sufficient reasons not given, but rule 23(c)(4)(A) exclusion of individual issues essentially approved); *Malcolm v. National Gypsum Co*., 995 F.2d 346, 350-353 (2d Cir. 1993) (disapproving consolidation for trial of forty-eight asbestos cases because too many different individual exposures, crafts, worksites, and diseases involved); *Jenkins*, 109 F.R.D. at 284 (observing, in justifying class trial of common issues and individual trials of individual issues of exposure-causation and damages, "[t]he experience of this Court . . . has been that the verdicts that have been rendered in favor of defendants have been rendered on the basis of a plaintiff's failure to prove exposure or to prove the existence of an asbestos-related injury. The defendants have not been successful on the state of the art defense)."

[43]Except for certain damages claims first authorized by the 1991 amendments thereto.

44

1992).  *See also Johnson v. Chapel Hill ISD*, 853 F.2d 375, 383 (5th Cir. 1988) (front pay).  Thus, in *Pettway* there was no Seventh Amendment right to jury trial.  *Johnson; Wilson*.  Here, by contrast, we have personal injury damage suits, the protypical Seventh Amendment case.  In the second place, *Pettway* involved only federal law, and hence this Court was not constrained by the Rules of Decision Act and *Erie*, as it is here.  Relatedly, *Pettway* involved what *Johnson* had characterized as an "equitable remedy, to be determined through the exercise of the court's discretion," while here the elements of liability and recoverable damages are fixed by state substantive law.[44]

Nor do we consider that *In Re Chevron U.S.A., Inc*., 109 F.3d 1016 (5th Cir. 1997), justifies the instant trial plan.  That action involved claims by approximately 3,000 neighboring property owners for personal injury and property damage allegedly caused contamination from Chevron's former crude oil storage waste pit. Apparently no form of class action was involved, although some cases were consolidated.  The district court directed that thirty individual plaintiffs be chosen, fifteen by the plaintiffs and fifteen by the defendants, and that there be "a unitary trial on the issues of 'general liability or causation' on behalf of the remaining plaintiffs, as well as the individual causation and

---

[44]Also, *Pettway* involved matters such as back pay among a class of employees, matters which by their nature are far more objectively measurable and far more reflected by measurable variables common to the group than are such inherently subjective, imprecise, and wholly individualized matters as physical pain, mental suffering, and loss of enjoyment of life which are significant damages elements in this kind of case.

damage issues of the [thirty] selected plaintiffs." *Id*. at 1017. Apparently, the individual causation and damage issues of the remaining *un*selected plaintiffs would be determined subsequently in individual trials (if the unitary trial established "liability on the part of Chevron for the pollutants that, allegedly, give rise to all of the plaintiffs' claims," *id*. at 1019). Chevron sought mandamus, contending "that the goal of the 'unitary' trial was to determine its liability, or lack thereof, in a single trial and to establish bellwether verdicts to which the remaining claims could be matched for settlement purposes." *Id*. at 1017. We stated that the thirty selected plaintiffs were not shown or chosen so as to be representative of the other plaintiffs, and observed that "[a] bellwether trial designed to achieve its value ascertainment function for settlement purposes or to answer troubling causation or liability issues *common* to the universe of claimants has as a core element representativeness . . . ." *Id*. at 1019 (emphasis added). We granted mandamus prohibiting "utilization of the results obtained from the trial of the thirty (30) selected cases for any purpose affecting issues or claims of, or defenses to, the remaining untried cases." While the majority opinion (one judge specially concurred) contains language generally looking with favor on the use of bellwether verdicts when shown to be statistically representative, this language is plainly *dicta*, certainly insofar as it might suggest that representative bellwether verdicts could properly be used to determine *individual* causation and damages for other plaintiffs. *Cf. Sterling*, 855 F.2d at 1200 (difference

46

between generic and individual causation). To begin with, no such question was before this Court, as the trial plan contemplated that individual causation and damages issues would not be controlled by the thirty individual bellwether verdicts, which would be used to encourage settlement. Moreover, what we did—our *holding*—was to prevent *any* preclusive use of the unitary trial results (whether for general causation *or* individual causation or otherwise) in cases other than those of the thirty selected plaintiffs.[45] And, we concluded that if the district court carried out another, different trial plan, that would present "matters for another panel to consider in the event those decisions are subject to appellate review." *Id*. at 1021. Finally, the majority opinion in *In Re Chevron U.S.A.* does not even cite *Fibreboard*, or the Seventh Amendment (or discuss the right to jury trial), and does not refer to the Texas substantive law elements of liability and damages in the matter before it. Clearly, *In Re Chevron U.S.A.* does not control the result here, and this panel is not bound by its dicta.[46]

In *Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996), a divided panel of the Ninth Circuit in a rule 23(b)(3) class action permitted recoverable tort damages to be determined in a lump sum for the entire class. *Hilao* was a suit under the Alien Tort Claims

---

[45]We also specifically stated that we expressed no opinion on whether the mix of claims there was such as to potentially authorize either bellwether trials based on appropriate sampling or a stand-alone, common issue trial. *Id*. at 1021.

[46]*See, e.g., Cosden Oil v. Karl O. Helm Aktiengesellschaft*, 736 F.2d 1064, 1070 n.7 (5th Cir. 1984) ("This panel, however, is not bound by dicta of a previous panel"); *Curacao Drydock Co. v. M/V Akritas*, 710 F.2d 204, 206 (5th Cir. 1984).

47

Act, and the Court essentially applied substantive principles of federal or international "common law." *See id*. at 776-778. The majority distinguished *Fibreboard* on the basis that there "the proposed procedure worked a change in the parties' substantive rights under Texas law that was barred by the *Erie* doctrine." *Id*. at 785 (footnote omitted). By the same token, *Hilao* is distinguishable here; it did not operate under the constraints of the Rules of Decision Act or *Erie*; the present case, by contrast, does operate under those constraints. If *Hilao* is not thus distinguishable it is simply contrary to *Fibreboard*, which binds us and which in our opinion is in any event correct. Further, *Hilao* did not address—and there was apparently not presented to it any contention concerning—the Seventh Amendment. Finally, we find ourselves in agreement with the thrust of the dissenting opinion there. *Id*. at 788 ("Even in the context of a class action, individual causation and individual damages must still be proved individually").

In sum, as *Fibreboard* held, under Texas law causation must be determined as to "individuals, not groups." And, the Seventh Amendment gives the right to a jury trial to make that determination. There was no such trial determination made, and no jury determined, that exposure to Pittsburgh Corning's products was a cause of the asbestos disease of any of the one hundred sixty phase III plaintiffs. Nor does the stipulation determine or establish that. Accordingly, the judgments in all the one hundred forty-three phase III cases before us must be reversed and

48

remanded.

We turn now to the extrapolation cases.  As to the matter of individual causation, it is obvious that the conclusion we have reached in respect to the phase III cases applies *a fortiori* to the extrapolation cases.  In the extrapolation cases there was no trial and no jury determination that any individual plaintiff suffered an asbestos-related disease.[47]  Indeed, in the extrapolation cases there was no trial at all—by jury or otherwise—and there was no evidence presented.  So, our holding as to the phase III cases necessarily requires reversal of the judgments in the five extrapolation cases before us.

As to the matter of actual damages, the extrapolation cases are likewise fatally defective.  Unlike the phase III cases, in the extrapolation cases there was neither any sort of trial determination, let alone a jury determination, nor even any evidence, of damages.  The district court considered that these deficiencies were adequately compensated for by awarding each extrapolation case plaintiff who alleged an asbestos-related disease an amount of actual damages equal to the average of the awards made in the phase III cases for plaintiffs claiming the same category of disease.  This plainly contravenes *Fibreboard*'s holding that under the substantive law of Texas recoverable damages are the "wage losses, pain and suffering, and other elements of compensation" suffered by each of the several particular plaintiffs

---

[47]Nor was there any summary judgment or Rule 50 judgment in that respect.  In some few of the cases, an asbestos-related disease may have been admitted.

49

as "individuals, not groups." We also observe in this connection that none of the experts at the extrapolation hearing puported to say that the damages suffered by the phase III plaintiffs in a given disease category (whether as disclosed by the phase III evidence or as found by the jury) were to any extent representative of the damages suffered by the extrapolation plaintiffs in the same disease category.[48] The procedure also violates Pittsburgh Corning's Seventh Amendment right to have the amount of the legally recoverable damages fixed and determined by a jury. The only juries that spoke to actual damages, the phase I and III juries, received evidence *only* of the damages to the particular plaintiffs before them, were called on to determine *only*, and *only* determined, each of those some one hundred seventy particular plaintiffs' actual damages individually and severally (not on any kind of a group basis), and were *not* called on to determine, and did *not* detrmine or purport to determine, the damages of any other

_____

[48]As previously observed, see notes 23, 24, and 25, *supra,* and accompanying text, comparability or representativeness were measured and found *only* in terms of certain specified variables, and these did not include, for example, matters which anyone claimed were representative of physical pain, mental suffering, loss of enjoyment of life, wage loss (past or future), or medical expenses. Similarly, Professor Frankewitz "made no attempt . . . to correlate or to identify any results or factors . . . that would predict or estimate what jury awards might be" and stated that none of what he did "related to magnitude of verdicts."

We also note that the testimony at the extrapolation hearing, particularly that of Dr. Dement and Professor Frankewitz, was fatally flawed because their information as to the distribution of the variables among the extrapolation plaintiffs (and to a large extent among the phase III plaintiffs) was simply based on what they had been furnished by clerks or paralegals in the office of plaintiffs' counsel, who did all the assignment of variables (and in some cases their interpretation) to particular plaintiffs, and was not supported by independent evidence.

plaintiffs or group of plaintiffs.[49]  We have held that "inherent

in the Seventh Amendment guarantee of a trial by jury is the

general right of a litigant to have only one jury pass on a common

issue of fct." *Blue Bird Body Co.*, 573 F.2d at 318.  This requires

that if separate trial are ordered, the separately tried issues

must be "distinct and separable from the others." *Id.*  *See also*

*Matter of Rhone Poulenc*, 51 F.3d 1293 (7th Cir.), *cert. denied*, 116

S.Ct. 184 (1995).[50]  By the same token, where the issues to be

---

[49]And we note that the phase III verdicts within each disease
category varied quite significantly.  There were mesothelioma
verdicts of $200,000 and of over $2 million, lung cancer verdicts
of $150,000 and of over $1 million, asbestosis verdicts of less
than $100,000 and of over $1 million, pleural verdicts of $150,000
and of over $1 million.  There were also twelve zero verdicts.
And, Professor Hazel "was struck" by the differences in verdicts as
between the two different juries that tried the phase III cases.
The phase III juries did not make average awards, they made a
series of very different individual awards.  The averages were
created by others after the fact.  And, if we look to averages, we
note that the average phase III verdict in pleural cases was higher
than that in both lung cancer and asbestosis cases, contrary to the
almost universal view that pleural disease is less serious and less
disabling than either lung cancer or asbestosis (and that of all
asbestos personal injury cases pleural cases have the least
settlement value).  Professor Hazel was unable to suggest any
explanation for this discrepancy.

[50]There the Seventh Circuit stated:

". . . the judge must not divide issues between separate
trials in such a way that the same issue is reexamined by
different juries. . . .  The right to a jury trial in
federal civil cases, conferred by the Seventh Amendment,
is a right to have juriable issues determined by the
first jury impaneled to hear them (provided there are no
errors warranting a new trial), and not reexamined by
another finder of fact.  This would be obvious if the
second finder of fact were a judge. . . .  But it is
equally true if it is another jury." *Id*. at 1303.

Similarly, where legal and equitable claims share one or more
overlapping common factual issues, the legal issues must first be
tried to the jury to protect Seventh Amendment rights that could be

51

separately tried *are* separable and distinct, the Seventh Amendment rights of the parties are preserved as to *both* sets of issues. *Blue Bird Body Co.*, 573 F.2d at 318. As the cited cases demonstrate, these principles are fully applicable in class actions for damages. It necessarily follows from these principles that the jury's phase III findings of the actual damages of each of the individual phase III plaintiffs cannot control the determination of, or afford any basis for denial of Pittsburgh-Corning's Seventh Amendment rights to have a jury determine, the distinct and separable issues of the actual damages of each of the extrapolation plaintiffs.[51]

We conclude that the extrapolation case judgments, as well as the phase III judgments, are fatally flawed, are contrary to the dictates of *Fibreboard*, and contravene Pittsburgh-Corning's Seventh Amendment rights. We do not act in ignorance or disregard of the asbestos crises. In *Amchem Products, Inc. v. Windsor*, 117 S.Ct. 2231, 2237-38 (1997), the Supreme Court called attention to the report of the Judicial Conference's Ad Hoc Committee on Asbestos Litigation, stating that "Real reform, the report concluded, required federal legislation creating a national asbestos-dispute resolution scheme." *Id*. at 2238. The Court also observed, "The argument is sensibly made that a nationwide administrative claims

---

infringed by prior bench trial determination of the common issues. *Roscello v. Southwest Airlines*, 726 F.2d 217, 221 (5th Cir. 1984).

[51]Nor are we aware of any legally valid ground on which the personal injury damages suffered by one person may be determined, without any evidence, solely on the basis of the average of awards made to other persons in similar cases.

processing regime would provide the most secure, fair, and efficient means of compensating victims of asbestos exposure. Congress, however, has not adopted such a solution." *Id.* at 2252 (footnote omitted). Nevertheless, the Court refused to stretch the law to fill the gap resulting from congressional inaction. As we said in *Fibreboard*, federal courts must remain faithful to *Erie* and must maintain "the separation of powers between the judicial and legislative branches." *Id.* at 711.[52] "The Judicial Branch can offer the trial of lawsuits. It has no power or competence to do more." *Id.* at 712.

We accordingly reverse the judgments before us in all the one hundred forty-three phase III cases and in all the five extrapolation cases, and those one hundred forty-eight cases are remanded for further proceedings not inconsistent herewith.

## B. Other Pittsburgh Corning Contentions; Plaintiffs' Cross-Appeal as to Pittsburgh Corning

We turn now to Pittsburgh Corning's remaining claims of error and to plaintiffs' cross-appeal as to Pittsburgh Corning. In light of our above holding, we pretermit any consideration of any remaining claims of Pittsburgh corning, and of any claims of error raised by plaintiffs in their cross-appeal as to Pittsburgh

---

[52]*Cf. Granfinanciera, SA v. Nordberg*, 109 S.Ct. 2782, 2790 n.4, 2795-97 (1989) (indicating that under the "public rights" doctrine Congress can, even in some cases not involving the federal government, sometimes limit what might otherwise be Seventh Amendment rights, when it acts for a valid legislative purpose under Article I and has created a seemingly private right so closely integrated into a public regulatory scheme as to be a matter appropriate for agency or specialized court resolution, and has assigned its adjudication to such an agency or specialized court, and jury trials would impair the functioning of the scheme).

Corning, which relate solely to some or all of the phase III cases or some or all of the extrapolation cases or solely to both. Any other claims of Pittsburgh Corning, and plaintiffs on their referenced cross-appeal, we consider solely insofar as they pertain to the nine judgments in the phase I class representative cases. We first consider Pittsburgh Corning's contentions; to the extent they sufficiently relate to the same subject matter, we consider plaintiffs' cross-appeal contentions along with the related Pittsburgh Corning contention.

### 1. Prejudgment Interest

The district court held that prejudgment interest on past actual damages accrued at the expiration of six months after the plaintiff's last exposure. Pittsburgh Corning contends, *inter alia*, that such accrual date is too early; plaintiffs in their cross-appeal contend it is too late. In *Owens-Illinois, Inc. v. Estate of Burt*, 897 S.W.2d 765 (Tex. 1995), the Texas Supreme Court held that in asbestos personal injury actions prejudgment interest commences to accrue six months after the date the defendant received notice of the claim or the date the lawsuit was filed, whichever is earlier.[53] The awards of prejudgment interest are hence vacated and remanded for recalculation.

### 2. Miscellaneous Asserted Trial Errors

Pittsburgh Corning complains that the district court

---

[53]Strictly speaking, this holding was directed to cases filed before September 2, 1987, but the court stated that it was "consistent with the current prejudgment interest statute which is applicable to actions commenced on or after September 2, 1987." *Id*. at 769.

erroneously excluded evidence it tendered of studies by Dr. Selikoff concerning the incidence of cancer among refinery workers. However, this claim as briefed to us relates only to the phase III cases; and, in the motion for new trial hearing Pittsburgh Corning stated "we didn't really use the refinery worker studies as such in the Phase I trial. We tried to use it in Phase 3, but in Phase 1 we used many studies other than the fivefold insulator study of Dr. Selikoff" and that prejudice was reflected as to phase III by the fact that "the [phase III] verdicts are multiples [of] what the compensatory results were in Phase I. I think it's a striking contrast." Pittsburgh Corning also complains about being limited as to its presentation of smoking evidence and of the jury instructions in that regard. Again, as briefed in this Court, this claim appears focused largely on phase III; and, at the motion for new trial hearing, Pittsburgh Corning observed that smoking evidence was allowed in the phase I trial and that of the ten phase I cases there was a defense verdict in one case and contributory negligence findings in four other cases, and in essence conceded that this claim was viable only as to phase III. We conclude that the refinery study and smoking contentions present no reversible error respecting the phase I cases.

Pittsburgh Corning complains that plaintiffs' counsel engaged in repeated improper appeals to bias, passion, and prejudice, as a result of which the phase I jury awards (and those in phase III, which we do not address) were excessive. While Pittsburgh Corning, understandably perhaps, rather exaggerates in this connection, it

is nevertheless regrettably true that plaintiffs' counsel stepped well out of line on several occasions. However, as to virtually all of these instances in which Pittsburgh Corning made objection, the objection was promptly and properly sustained and, on request, an appropriate instruction was given. Some of what is raised on appeal in this connection was not objected to below. Considering the phase I evidence and verdicts, the length of the phase I trial, and the trial court's rulings, we are not persuaded that reversible error has been demonstrated or that manifest injustice would result by allowing the verdict to stand. *See Johnson v. Ford Motor Co.*, 988 F.2d 573, 582 (5th Cir. 1993); *Mills v. Beech Aircraft Corp., Inc.*, 886 F.2d 758, 765 (5th Cir. 1989); *Wilson v. Johns-Manville Sales Corp.*, 810 F.2d 1358, 1362 (5th Cir.), *cert. denied*, 484 U.S. 828 (1987).[54]

Pittsburgh Corning asserts error in the trial court's refusal to furnish the prospective jurors a list of all the over two thousand class members so the jurors could be questioned about whether they knew any of them. The district court determined that this was impractical and unnecessary. The prospective jurors had the ten individual class representatives identified to them. Each

---

[54]As to Pittsburgh Corning's complaint that one of its witnesses was served with a subpoena in the courtroom just after testifying, the service occurred during a break, outside the presence of the jury and the judge. When the proceedings resumed, the district court reprimanded plaintiffs' counsel. Pittsburgh Corning mentions adverse audience reaction on a couple of occasions, but the district court properly handled those matters. Neither of these occurrences, or the use of the demonstrative box alluded to by Pittsburgh Corning, presents any reversible error, whether considered alone or in the aggregate with the other claims in this connection.

prospective juror had already filled out a 53-part questionnaire, and the completed questionnaires were available to counsel. Among other things, this questionnaire asked whether the prospective juror knew anyone suffering from an asbestos-related disease and, in a separate question, whether the prospective juror "knew of anyone who has or had a lawsuit concerning alleged asbestos-related injuries." If the latter question were answered "yes," the person or persons so known were to be named and an explanation given.[55] The district judge's questioning of the prospective jurors resulted in several being excused because of their relationship with persons who suffered from asbestos-related disease.[56] The parties were then afforded an opportunity to *voir dire* the prospective jurors, including asking individuals about their answers to the above identified questions on the questionnaire. And, Pittsburgh Corning did ask certain jurors about their referenced answers. No complaint is made that *voir dire* by counsel was unduly restricted in this respect. A district judge generally has broad discretion in determining how best to conduct *voir dire*, *United States v. Greer*, 968 F.2d 433, 435, 441 (5th Cir. 1992), *cert. denied*, 113 S.Ct. 1390 (1993), but that discretion is abused if the scope of *voir dire* is inadequate to discover bias or deprives a party of an opportunity to make reasonably intelligent use of his peremptory

---

[55]Another separate question asked "have you read, heard about or seen any reports about court cases or lawsuits about asbestos," with a "yes" answer calling for an explanation.

[56]The district court also asked the prospective jurors whether, should they later learn that someone they knew was a member of the class, they could set that aside in their deliberations.

57

challenges. *Id*. at 435, 443. Considering together the questionnaire, the court's questions to the panel, and the individual *voir dire* allowed the parties, we conclude that no abuse of discretion has been shown, although the better practice would have been to furnish the prospective jurors the class list.

3. Recusal

We reject, as we earlier did in denying Pittsburgh Corning's petition for mandamus raising the identical contentions, Pittsburgh Corning's claims that the district judge who initially primarily presided over these cases should have recused himself earlier, as well as that the successor district judge did not properly rule on their motions raising that matter. After again thoroughly considering the matter, we find these contentions to be without merit.

4. Exemplary Damages

Pittsburgh Corning raises several challenges to the award of exemplary damages. It complains of the admission of evidence concerning its Tyler asbestos plant. Although none of the class had worked there and the asbestos exposure there was far greater than at the twenty-two sites at issue, the evidence was relevant to the exemplary damages issue as having some tendency to show Pittsburgh Corning was aware of, and consciously indifferent to, the risks posed by the asbestos it manufactured. A limiting instruction was given in this connection. No abuse of discretion in the admission of this evidence has been established. *See King v. Anthony world Industries*, 906 F.2d 1022, 1026 (5th Cir. 1990),

*cert. denied*, 500 U.S. 942 (1991).

Further complaint is made by Pittsburgh Corning as to the district court's instructions concerning exemplary damages and what was necessary to find in order to impose them. To the extent that these contentions are predicated on proper objections made at trial, we conclude that the instructions, when taken and considered as a whole, were adequate, though not perfect, and that any deficiency did not prejudice Pittsburgh Corning's substantial rights. *See Russell v. Plano Bank & Trust*, 130 F.3d 715, 719 (5th Cir. 1997). Some challenges to the instructions that Pittsburgh Corning now raises are not supported by proper objection below, and as to these we conclude that reversal under the plain error doctrine is not appropriate here. *Id*. at 719, 721. The use of a multiplier to determine punitive damages is likewise challenged by Pittsburgh Corning. However, our decisions in *Jenkins* and *Fibreboard* mandate rejection of that challenge. It is also contended that the multiplier of three that the jury assigned to Pittsburgh Corning is excessive, both generally and as a matter of due process. We reject this contention. *See Edwards v. Armstrong World Industries*, 911 F.2d 1151, 1154-55 (5th Cir. 1990).[57] In another variation of its excessiveness argument, Pittsburgh Corning calls attention to the fact that the district court, after

---

[57]We note that neither Pittsburgh Corning nor plaintiffs sought to submit evidence of Pittsburgh Corning's financial resources or insurance coverage or evidence of other asbestos damage awards of any kind which Pittsburgh Corning had paid or as to which final judgments were outstanding against it. *See Owens-Corning Fibreglass v. Malone*, __ S.W.2d __, 41 Tex. Sup. Ct. J. 877, 1998 WL 288690 (Tex. 1998).

initially concluding that the multiplier applied to all actual damages, granted a remittitur by its ruling that the multiplier applied only to the share of actual damages for which Pittsburgh Corning was liable. This, says Pittsburgh Corning, was an eighty percent reduction (much larger, it says, in the phase III and extrapolation cases), and under *Wells v. Dallas ISD*, 793 F.2d 679, 683-84 (5th Cir. 1986), mandates a new trial. We disagree. The district court initially observed that as to punitive damages, "[t]he jury verdict is well supported by the evidence and does not offend the Texas proportionality rule." Although it then concluded that the multiplier should apply to the entire amount of actual damages found, it reserved "for another day" whether "for equitable considerations or by way of remittitur" it should limit the multiplier to the share of actual damages for which Pittsburgh Corning would be liable. It ultimately so limited the multiplier.[58] In doing so, however, the court expressly stated "This Court does not find the amount of the multipliers to be excessive as to suggest that passion rather than reason motivated the jury." The Court went on, in the same opinion, to state:

> "Taking into account equitable considerations, and in the nature of a remittitur, the Court has decided to apply the multipliers set for a defendant to that defendant's allocated share of actual damages. This ruling also most closely comports with the holding in *Edwards v. Armstrong World Industries, Inc.*, 911 F.2d at 1154."

Plaintiffs contend "there was not an actual remittitur." Given the

---

[58]Plaintiffs do not challenge this ruling in their cross-appeal.

60

district court's having expressly found that the multiplier verdict was well supported by the evidence, was proportional, and was the product of reason, not passion, it appears to us that the court was in part interpreting the jury's verdict—which, after all, was a multiplier, not a stated sum—in accordance with its most likely intent and in part was attempting to conform the judgment to the assumptions implicit in our *Edwards* decision. In that Texas law diversity suit for asbestos personal injury damages, we "review[ed] the proportionality of the punitive damage award against Celotex in comparison with its allocated share of actual damages" and, so doing, did "not find it so excessive as to suggest that passion rather than reason motivated the jury." *Id*. at 1154. Based on the foregoing, it is clear to us that the doctrine of *Wells v. Dallas ISD* is not applicable here. We reject Pittsburgh Corning's challenges to the punitive damage award.

Plaintiffs present two challenges to the punitive damages award. First, they contend that the multiplier should be applied not only to the actual damages awarded by the jury, but also to the prejudgment interest which was subsequently awarded by the court. They contend in this connection that Texas law regards prejudgment interest as a component of actual damages, citing, among other cases, *Benavides v. Isles Construction Co.*, 726 S.W.2d 23, 25 (Tex. 1987); *Paramore v. Nehring*, 792 S.W.2d 210 (Tex. App.—Austin 1990, no writ); *El Paso County Water Imp. Dist. No. 1 v. Grijalua*, 783 S.W.2d 736, 740 (Tex. App.—El Paso 1990), *writ denied*, 795 S.W.2d 705 (Tex. 1990); and *Wood v. Armco*, 814 F.2d 211, 215 (5th Cir.

61

1987).  These cases do not address the issue now before us.  Many of them, such as *Benavides, El Paso County Water Imp. Dist. No. 1*, and *Wood* are essentially pleading cases, stating in general terms that "common law" prejudgment interest is an element of actual damages that has to be specifically pleaded for.  *Paramore* held that prejudgment interest was a part of "the actual damages" which the Texas Deceptive Trade Practices Act (DTPA), Tex. Bus. & Com. Code § 17.50(b)(1), *required* the trial court to double when rendering judgment.  However, *Paramore* recognizes that three other Texas Courts of Appeals had held otherwise, and in each of those three cases the Texas Supreme Court had refused application for writ of error "no reversible error."  *See Paramore*, 792 S.W.2d at 211-212.  Since *Paramore*, the Fourteenth Court of Appeals declined to follow its approach and has continued to hold "that prejudgment interest should not be included as actual damages before trebling" under the DTPA.  *Roberts v. Grande*, 868 S.W.2d 956, 960 (Tex. App.—Houston [14th] 1994; no writ).[59]  Moreover, in a case such as this there are no *mandatory* punitive damages, and whether to award them, and how much to award, is a question for the jury (subject to review for excessiveness).  Here, the most reasonable view of the verdict—one apparently shared by the trial court—is that it does not reflect on intention to have the multipliers it selected apply to anything other than "actual damages" or "compensatory damages" as defined in the court's charge and as fixed by the phase I jury

---

[59]And, the Texas legislature likewise has in effect overruled the *Paramore* approach.  *See* Tex. Bus. & Com. Code § 17.50(e) (Acts 1995, 74th Leg. ch. 414 § 5).

for the class representatives (and to be fixed by the phase III juries for the other class members). There was no mention of prejudgment interest in the charge, and the definition and elements of "actual damages" (or "compensatory damages") as given in the charge included only the conventional elements (and not prejudgment interest or anything similar thereto) and purported to be complete. The jury was told that class members would "have to prove, first of all, whether they are entitled to compensatory, or actual damages, and if so, the amount," and "if you award punitive damages, what you are asked to do is make an award for each one dollar of actual damages which may subsequently be determined for a particular plaintiff . . . an amount that would be a fraction of one dollar or a multiple of one dollar for each dollar of actual damages . . . for each one dollar of actual or compensatory damages." The phase I jury proceeded to fix the "compensatory damages" for each of the class representatives, as well as the multiplier for each defendant. The most reasonable interpretation of the verdict is that the jury intended the multiplier to apply only to the actual or compensatory damages as found by them, not to something else. We reject plaintiffs' claim that the multiplier should be applied to prejudgment interest.

Plaintiffs' final contention in their cross-appeal as to Pittsburgh Corning is that we should hold it "jointly and severally liable for the exemplary damages assessed against it and Celotex." We reject this contention. Plaintiffs base their argument on *Hofer v. Lavender*, 679 S.W.2d 470 (Tex. 1984), in which the Texas Supreme

63

Court held that the wrongdoer's estate could be liable for punitive damages, relying in part on the notion that such damages were not simply to punish the guilty party, but also to "reimburse for losses too remote to be considered as elements of strict compensation" or "to compensate for inconvenience and attorney's fees." *Id*. at 474. Plaintiffs also rely on *Celotex Corp. v. Tate*, 797 S.W.2d 197, 208-209 (Tex. App.—Corpus Christi 1990; no writ), where the court, in rejecting a due process challenge to a punitive damage award based on the contention that the defendant was being subjected to successive multiple punishments for the same conduct, relied on the above language from *Hofer* in stating that punitive damages had a compensatory component as to each plaintiff, that the jury was instructed in the quoted *Hofer* language, and that it could not be determined what portion of the exemplary damages award related to the *Hofer* nonpunitive components. These authorities do not address the question of joint and several liability for punitive damages.

We believe plaintiffs seek to assign to *Hofer* and *Celotex* a weight which they will not bear. We reviewed those two decisions, and a host of other Texas authorities, in *Estate of Moore v. C.I.R.*, 53 F.3d 712 (5th Cir. 1995), where we stated:

> ". . . [T]he Texas Supreme Court has emphasized at least since 1847 that exemplary damages are awarded not to compensate the plaintiff for any injury received but to punish the defendant and to deter others. [citations omitted] This Court too has repeatedly stated that exemplary damages are not compensatory under Texas law. *Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468, 474 (5th Cir. 1986) ('The purpose of punitive damages is not to compensate the victim but to create a deterrence to the defendant, and to protect the public interest.');

64

[citations omitted].

. . . .

        We also note that the year after the Texas Supreme Court released its opinion in *Hofer*, the court determined that prejudgment interest is not available on exemplary damages precisely because of their non-compensatory nature. The court stated: 'Punitive damages are intended to punish the defendant and to set an example to others. . . . They are assessed over and above the amount of damages necessary to indemnify the plaintiff. The plaintiff can thus be made whole even if prejudgment interest is not awarded on punitive damages.' *Cavnar v. Quality Control Parking, Inc*., 696 S.W.2d 549, 555-56 (Tex. 1985) (citation omitted).

        Texas courts have also rejected arguments that punitive damages should be reduced in proportion to the percentage of negligence attributed to the plaintiff. Reduction of punitive damages is not appropriate because '[t]he purpose of awarding exemplary damages is not to compensate the plaintiff, but to punish and set an example to others.' *Elbar, Inc. v. Claussen*, 774 S.W.2d 45, 53 (Tex. App.—Dallas 1989, writ dismissed as moot); [citations omitted].

. . . .

        There is no requirement that exemplary damages bear any relation to the plaintiff's inconvenience, attorney's fees, or losses too remote to be considered as elements of actual damages." *Id*. at 715-716.

In *Estate of Moore*, we concluded by stating that "[t]he overwhelming weight of Texas authority holds that exemplary damages are not awarded to compensate the plaintiff for any injury" and that the "fundamental truth" is that "exemplary damages in Texas are awarded on account of and in proportion to the defendant's wrongful conduct." *Id*. at 716. *See also Ellis County State Bank v. Keever*, 888 S.W.2d 790, 796, 798 (Tex. 1994), which reiterates the holding of *Cavnar v. Quality Control Board*, 696 S.W.2d 549, 555-56 (Tex. 1985), that prejudgment interest is not recoverable on

65

punitive damages *because* "'[p]unitive damages are intended to punish the defendant and to set an example to others. They are assessed over and above the amount of damages necessary to indemnify the plaintiff,'" and which goes on to state that "[p]unitive damages, being inherently penal in character, should not be enlarged by the imposition of prejudgment interest."[60]

Whatever may be the case where defendants, each with malice, act jointly to commit a single wrong, and the jury assesses a *single* punitive damages award in one specified dollar amount "jointly against said defendants," *see Waggoner v. Wyatt*, 94 S.W.1076, 1078 (Tex. Civ. App. 1906; writ refused),[61] that is not the situation here. Here the theory of liability against defendants as submitted to the jury was not one of joint action (or civil conspiracy), but strictly of individual action, often taken at widely different times (*e.g.,* Fibreboard and Celotex during the period after 1942, Pittsburgh Corning only after 1962). Further, the jury instructions concerning punitive damages mentioned only punishment for wrongdoing and setting an example to deter others, and did not include any *Hofer*-type element such as compensation for losses too remote to be covered by actual damages, or for

---

[60]See also Tex. Civ. Proc. & Remedies Code § 41.006 (applicable to actions filed after September 2, 1987), which provides that a punitive damages award "must be specific as to a defendant" and "each defendant is liable only for the amount of the award made against that defendant."

[61]*See also St. Louis & S.W. Ry. Co. of Texas v. Thompson*, 113 S.W. 144, 147 (Tex. 1908).

inconvenience or attorney's fees.[62]   Finally, punitive damages

liability and the multiplier were each fixed by the jury separately

from each other and separately for each defendant.  The multiplier

ultimately assessed by the jury was different for each defendant

(except Carey Canada and Fibreboard were each separately assessed

a $1.50 multiplier).  Obviously, what the jury contemplated was

separate, several punitive damages awards as to each defendant.  We

know of nothing in Texas law which prevents this.

Finally, reliance on a *Hofer*-type quasi-compensatory approach

to impose joint and several liability for the separate punitive

damages awards would render suspect the entire multiplier concept

in this kind of phased trial.  As previously noted, the multiplier

concept was approved in *Jenkins* on the basis that punitive damages

were "not to compensate the victim," *id*., 782 F.2d at 474, and that

having them vary with actual damages (by a multiplier for each

defendant severally based on the wrongfulness of its conduct) would

preserve the necessary individual consideration because in the

subsequent individual cases each individual's actual damages would

---

[62]Thus, the phase I charge stated:

> "Exemplary damages or punitive damages means an amount that you may, in your discretion, award as an example to others and as a penalty or by way of punishment, in addition to any amount that you find as actual damages.
> To say it another way, there are several purposes behind an exemplary damage award, include [sic] punishing the wrongdoer, setting an example so that others may be deterred from similar conduct in the future.
> Simply put, this issue is that of just punishment, not fair compensation.  The focus in this regard is on the Defendants' conduct, not on the product."

be found. However, the *Hofer* quasi-compensatory factors were not submitted as part of actual (or punitive) damages and they do not necessarily vary with variations in the amount of actual damages.

It is plain then that the trial here, and the trial plan, so far as concerned punitive damages and the multiplier, was formulated, approved, and conducted on the assumption that such damages were entirely punitive and to serve as an example and were several as to each defendant and related only to the wrongfulness of its conduct. We accordingly reject plaintiffs' contention that Pittsburgh Corning should have been held liable for Celotex's punitive damages.

5. Effect of Celotex Bankruptcy

As previously noted, Celotex filed chapter 11 (and was severed) after all the phase III verdicts were returned (and before Fibreboard settled). The district court held Pittsburgh Corning liable for all of Celotex's fifteen percent causation share (in the phase I cases; ten percent in the phase III and extrapolation cases) of actual (not exemplary) damages. Pittsburgh Corning contends that Celotex's share should not all be allocated to it but should instead be ratably redistributed among the settling defendants (including Fibreboard), Pittsburgh Corning, and any contributory negligent plaintiff, in the proportion which their assigned causation percentages bear to each other. Were we to fashion what we believe would be the most appropriate rule, we would tend to agree with Pittsburgh Corning. But precedent bars the way.

*Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex. 1984), which the parties agree and agreed below controls this issue, provides for joint and several liability as to nonsettled shares, with the particular view of protecting the plaintiff against an insolvent, nonsettling defendant. *Id*. at 429. Celotex was not a settling defendant. Had Celotex taken bankruptcy before trial, its comparative causation share would not have been submitted to the jury, and Pittsburgh Corning could not reduce its liability by virtue of any claimed partial causation by Celotex. That much is clear from *Duncan*, and is not really disputed by Pittsburgh Corning. *See also Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129, 1140-41 (5th Cir. 1985). Likewise, had Celotex taken bankruptcy *after* the judgment became final, Pittsburgh Corning would remain liable for Celotex's fifteen percent share. That, too, is clear from *Duncan*. So why should it make any difference that Celotex's bankruptcy came after the verdict but before final judgment? The answer to that question is that Celotex's share of causation, along with Fibreboard's and Pittsburgh Corning's and that of the previously settling defendants and, in some instances, that of a negligent plaintiff, *was* determined by the jury, in percentages that totaled one hundred percent (as the instructions required). Logically, it should be assumed that proportionate allocation of Celotex's percentage share of causation among the others would produce the same result as if Celotex's share had never been submitted at all (as it would not have been if it had taken bankruptcy prior to trial). For example, if at trial

69

Pittsburgh Corning was assessed 20% causation and Celotex 15% and others a total of 65%, then if Celotex's 15% is reallocated, Pittsburgh Corning's causation share amounts to some 23.53% (20/85), not 35% (20% + 15%). That—20/85ths—is what the jury *actually* found *was* Pittsburgh Corning's proportion of causation among those whose causation now has legal relevance. However, that sort of approach was rejected, at least for post-judgment insolvency, in *Duncan*, where the Court said:

> "An alternative would be to reallocate the insolvent tortfeasor's share of liability among all parties whose actions or products were a cause of the injuries, including the negligent plaintiff. This suggestion is attractive and was endorsed by a distinguished Special Committee of the Tort and Compensation Section of the State Bar. As a judicial rule, however, reallocating the insolvent's share would create problems of post-trial jurisdiction and finality of judgments." *Id*. at 429, n.9.

The last sentence of this passage suggests that the *Duncan* court may have only been speaking to the situation where a nonsettling bankrupt becomes insolvent after the judgment is final. As for pretrial insolvency, there would be no need to thus "reallocate," as the causative fault of a nonsettling defendant would simply not have been submitted to the jury. Arguably, then, *Duncan* does not *necessarily* preclude acceptance of Pittsburgh Corning's argument.

On the other hand, *Duncan* can also perhaps reasonably be read as generally rejecting this sort of proportionate reallocation. That, in substance, is how we read it in *Whatley v. Armstrong World Industries, Inc*., 861 F.2d 837 (5th Cir. 1988). In that Texas law asbestos case, the plaintiff settled before trial with twelve defendants and proceeded to trial against Raymark alone. The jury

found Raymark and 10 of the settling defendants guilty of causative fault, assigning to Raymark and to 9 of the settling defendants each a 9.09% causation share and to the tenth settling defendant a 9.1% share, for a total of 100%. Plaintiff's damages were thus reduced by 90.01% for purposes of its judgment against Raymark in the trial court. Plaintiff appealed, urging there was no evidence to support a finding of causative fault as to several of the ten settling defendants. We agreed as to 2 of them (who each had 9.09% shares), and hence reformed the judgment by assigning to Raymark the *entirety* of those two settling defendants' shares, making Raymark liable for 27.27% (3 x 9.09%) of plaintiff's total damages. *Id*. at 842-44. Although we did not expressly address a proportional reallocation—under which Raymark's share would become not 27.27% but rather 11.11% (9.09/81.82)—our judgment necessarily rejected it. The dissent expressly contended that Raymark was entitled to a new trial on allocation, but the majority rejected that approach, holding that automatic reallocation of the *entirety* of the share of each nonliable settling defendant to Raymark was required as a matter of law by *Duncan*.[63]

---

[63]Pittsburgh Corning contends, not without some force, that its approach is supported by *Bowers v. Firestone Tire & Rubber Co.*, 832 F.2d 64 (5th Cir. 1987). In that Texas law case, Bowers, injured in a tire explosion, sued Firestone, General Motors (GM), and Budd Company (Budd). The jury assessed comparative causation 25% to Bowers, 50% to Firestone, 12½% to GM, and 12½% to Budd, but *also* found that Bowers was *not* at fault. The trial court, because of the latter finding, disregarded the 25% causation finding as to Bowers, and proportionally reallocated the causative shares of the defendants to be 66 2/3% (50/75) for Firestone, 16 2/3% (12½/75) for GM, and 16 2/3% (12½/75) for Budd. *No complaint was made on appeal to these rulings*. Firestone and GM settled with Bowers in lieu of appealing. Budd appealed, claiming that the evidence

We conclude, albeit reluctantly, that *Whatley*, and its interpretation of *Duncan*, compel rejection of Pittsburgh Corning's reallocation arguments respecting Celotex.

To the extent that Pittsburgh Corning complains that its subrogation rights against Celotex are prejudiced, we disagree. Pittsburgh Corning's discharge of the judgment will entitle it to be subrogated to plaintiffs' rights as against Celotex. *See Gideon*, 761 F.2d at 1140-41.

We reject Pittsburgh Corning's complaints as to the effect on

---

showed Bowers was negligent as a matter of law, that the weight of the evidence against Bowers entitled Budd to a new trial on that issue, and that the form of the contributory negligence special issues was improper. *Bowers v. Firestone Tire & Rubber Co*., 800 F.2d 474, 476-78 (5th Cir. 1986). Bowers cross-appealed because the judgment awarded him nothing for prejudgment interest. We held Bowers was entitled to prejudgment interest and remanded. *Id*. at 478-79. On remand, the district court held that Bowers was entitled to prejudgment interest on only the actual damages for which Budd was liable (16 2/3% of the total). Bowers again appealed, claiming *not* that Budd's 16 2/3% share of the actual damages as fixed in the judgment was in error, but rather *only* that Bowers was entitled to recover from Budd prejudgment interest on 100% (not, say, 37½%) of the actual damages. *Bowers*, 832 F.2d at 66-67. We rejected this contention, holding that Firestone and GM had settled all their liability and that that included prejudgment interest. We did not address, and there was not before us, any issue as to the propriety of the 66 2/3%, 16 2/3%, and 16 2/3% allocation. No claim was made that Bowers was entitled to recover more than 16 2/3% of his actual damages from Budd—or that Budd should not have been assessed more than 12½% of the actual damages; the only issue was whether Bowers was entitled to recover from Budd prejudgment interest on 100% (not *any* lesser percentage) of his actual damages rather than merely on the same percentage thereof as Budd was liable for. Moreover, the trial court's action there can be viewed not so much as a reallocation as an interpretation of the verdict such that the verdict itself did not find any causative fault on the part of Bowers. We conclude that *Bowers* is not controlling.

72

its liability share of the Celotex chapter 11.[64]

### C. Conclusion on Pittsburgh Corning's Appeal and Plaintiffs' Related Cross-Appeal

In sum, we reverse the judgments in all the 143 phase III cases and in all the 5 extrapolation cases before us and those cases are remanded for further proceedings not inconsistent herewith. As to the judgments against Pittsburgh Corning in the nine class representative cases before us, we reject all of the contentions raised on cross-appeal by plaintiffs and, with the single exception of the date on which prejudgment interest commences to accrue, we likewise reject all of Pittsburgh Corning's contentions on appeal. The nine class representative cases before us as against Pittsburgh Corning are remanded for the sole purpose of recalculating prejudgment interest based on the accrual date specified in this opinion, and in all other respects said nine judgments against Pittsburgh Corning are affirmed.

II.

ACL APPEAL

### A. Introduction

ACL appeals the two judgments rendered against it in two of the nine class representative cases.[65] Plaintiffs cross appeal as

---

[64]Pittsburgh Corning also argues that Fibreboard, because it settled after Celotex filed for chapter 11, actually settled more than its causative share as found by the jury. We reject this contention. A settling defendant cannot settle more than its jury-determined share. *International Proteins Corporation v. Ralston-Purina*, 744 S.W.2d 932 (Tex. 1988).

[65]These are the case in which the plaintiffs are the Estate of Norman Atchison, Sammy Atchison, and Clarence Atchison, and the case in which the plaintiffs are Lowell Nations and Ann Mae

73

to ACL.

As previously noted, the cases against ACL were bench tried by virtue of the Foreign Sovereign Immunities Act.

ACL is a Canadian corporation, a majority of whose shares are owned by the government of Quebec, Canada. ACL mined chrysotile asbestos in Canada. During the years 1951-1961, ACL sold and shipped the raw asbestos, minimally processed by it, to Fibreboard in the United States. The product was considered raw asbestos when received. Fibreboard refined the raw asbestos, blended it with asbestos, including amosite asbestos, obtained from other suppliers, and incorporated it into many asbestos-containing finished products manufactured and sold by Fibreboard, including insulation products—the only products at issue in this case—and other products such as shingles and linoleum.[66] There was evidence, which the district court credited, that during those years 1951-1961 ACL supplied at least fifty percent of the asbestos used by Fibreboard. In 1962, Fibreboard ceased its purchases from ACL. ACL was never involved in the design, manufacture, sale, or distribution of the insulation products at issue here (or, apparently, any other asbestos-containing finished products).

The district court ruled that "ACL's liability to the plaintiffs arises through the plaintiff's exposure to Fibreboard products which contained asbestos supplied by ACL." But it went on

Nations.

[66]The district court held that Texas substantive law applied to the claims against ACL. No party challenges that ruling on appeal.

to hold that ACL was *not* liable to any phase III or extrapolation plaintiff because "ACL was not a party to the Phase II stipulation," so nothing in the stipulation could be used against ACL, and "[t]he Court has heard no independent evidence of exposure to Fibreboard products from which the Court could make findings to form a basis of liability"—presumably to any particular phase III plaintiff or to any extrapolation plaintiff—"against ACL for its fibre contribution to the Fibreboard insulation products."  The court did find, however, that "[t]here was sufficient evidence presented in Phase I to support a finding that the Phase I plaintiffs were exposed to asbestos supplied by ACL through exposure to Fibreboard products."  Nevertheless, the court held that, *except* for the plaintiffs in the Nations and Atchison cases (see note 65, *supra*), limitations barred recovery against ACL by any other phase I or class representative plaintiff.[67]

With respect to the two cases in which ACL was held liable, the following appears to be the district court's material findings and conclusions.  In its initial findings and conclusions, the district court stated:

> "The evidence also shows that ACL knew or should have known as early as 1935 that asbestos workers and household members of asbestos workers were at risk of getting an asbestos-related injury or disease from the application, use, or removal of Defendants' asbestos-containing insulation products. . . .  ACL sold its product to intermediaries.  These intermediaries

---

[67]No complaint is made by any party on appeal as to this limitations ruling; nor does any party complain on this appeal of the district court's dismissal of the conspiracy claims against ACL or its ruling that the Foreign Sovereign Immunities Act prevented any claim for exemplary damages against ACL.

incorporated the asbestos into finished products and sold the products to the worksites where the Plaintiffs allege they were exposed to asbestos. . . .    The issue is whether ACL's reliance on its intermediaries to pass on warnings concerning the dangers of asbestos to users of asbestos products was reasonable.  *See Alm v. Aluminum Co. of America*, 717 S.W.2d 588, 592 (Tex. 1986) . . . . In other words, were ACL's intermediaries capable of passing on a warning and, if not, did ACL know about that incapacity?  The specific question this Court must answer is the following:  Did ACL have actual knowledge that the raw asbestos it supplied to its intermediaries was being made into insulation products and sold by such companies without an adequate warning?  The evidence in the record establishes that ACL did have such knowledge.

It is apparent that ACL's liability is derivative of the intermediaries to which it sold its raw asbestos.

. . . .

The evidence does show that, from 1951 until 1961, Fibreboard Corporation purchased over 50% of its raw asbestos from ACL."[68]

The district court later reiterated these findings.[69]  The district

---

[68]The court also found:

"With the exception of Fibreboard's products, it is not possible for the Court to determine from the record how much of ACL's raw asbestos found its way into the Defendants' products to which the class representatives were exposed.  The Court is also persuaded from the evidence that, with the exception of Fibreboard's products, the Plaintiffs will not be able to prove the amount of ACL fibers contained in the Defendants' products to which the remaining Plaintiffs were exposed."

No party has challenged this finding on appeal.

[69]The court stated:

". . . the Court found that ACL knew or should have known as early as 1935 that asbestos workers and household members of asbestos workers were at risk of getting an asbestos-related injury or disease from the application, use or removal of asbestos containing insulation products.  The Court found that from 1951 until 1961, Fibreboard Corporation purchased over 50% of its raw asbestos from ACL.  The Court also found that ACL had

76

court determined that ACL's liability to a particular class representative plaintiff would be a fraction of one-half the Fibreboard causative share of that plaintiff's actual damages as found by the jury; the fraction would have as its numerator the number of years after 1951 that that plaintiff was exposed to Fibreboard's asbestos-containing insulation products and as its denominator the total number of that plaintiff's working years on which the jury based on its actual damages award to that plaintiff. ACL's liability would be joint and several with the liability of other defendants. The court further ruled that "Fibreboard's liability for actual damages [to such a phase I plaintiff] will be reduced by the amount" of ACL's liability to that plaintiff.

## B. ACL Claims of Error

On appeal, ACL challenges the judgments against it on essentially two bases. First, it contends, in a variety of arguments, that as a mere bulk supplier of a raw material later incorporated into various finished products by another (Fibreboard), not all of which products are unreasonably dangerous or defective, it owed no duty to the plaintiffs who were harmed by exposure to that raw material through exposure to one particular type of finished product (insulation products). Second, it contends that any liability it may have is in any event derivative of that of Fibreboard, so Fibreboard's settlement discharged it.

---

actual knowledge that the raw asbestos it supplied to Fibreboard Corporation was being made into insulation products and sold by Fibreboard without an adequate warning."

77

1. Mere Supplier

The district court seems to have based its liability determination against ACL on ACL's failure to warn the users of Fibreboard insulation products, given that ACL knew such insulation products were otherwise dangerous and that Fibreboard was not giving a warning, or an adequate waiving.

The district court did not find that ACL's raw asbestos was defective or unreasonably dangerous when sold to Fibreboard, or that Fibreboard was not a sophisticated and knowledgeable manufacturer of asbestos containing finished products; nor did the court find that all or substantially all of the diverse finished products manufactured by Fibreboard and containing ACL-supplied raw asbestos were defective or unreasonably dangerous. The only products at issue here were insulation products, and the district court imposed liability on Fibreboard and the other manufacturer defendants because their insulation products were, as the phase I jury found, "defective and unreasonably dangerous as a result of not having an adequate warning." We have held that not all asbestos-containing finished products are defective or unreasonably dangerous. *See, e.g., Gideon*, 761 F.2d at 1143 ("We have refused to hold asbestos products inherently dangerous"), and 1145 ("As to Raymark, we are unable to find . . . that the danger created by the use of its products [asbestos packings] outweighed their utility. . . all asbestos-containing products cannot be lumped together in determining their dangerousness"). *See also, e.g., Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1207 (5th Cir. 1991). If asbestos-

containing finished products are not all unreasonably dangerous or defective, then it necessarily follows that ordinary raw asbestos sold to a sophisticated and knowledgeable manufacturer of such products is not of itself defective or unreasonably dangerous. Nor did the district court find that ACL failed to adequately warn Fibreboard or that Fibreboard was not fully knowledgeable of the relevant risks posed by its asbestos-containing insulation products. Indeed, the evidence virtually compels the conclusion that Fibreboard was so aware. That being the case, any failure to warn Fibreboard would be clearly immaterial. *See, e.g., Restatement Third, Torts: Products Liability* (1997) § 2, comment i_ ("Notwithstanding the defective condition of the product in the absence of special warnings, if a particular user or consumer would have decided to use or consume even if warned, the lack of warnings is not a legal cause of the plaintiff's harm").[70]

In imposing liability on ACL, the district court relied on *Alm v. Aluminum Co. of America*, 717 S.W.2d 588 (Tex. 1986).[71] That case was a suit by James Alm for personal injuries suffered when the cap on a bottle of 7-Up he had purchased exploded off the bottle and

---

[70]*See also id*. comment j_, explaining that a product seller is not liable for failure to warn of risks "that should be obvious to, or generally known by, foreseeable product users" *because* "[w]hen a risk is obvious or generally known, the prospective addressee of a warning will or should already know of its existence. Warning of an obvious or generally known risk in most instances would not provide an effective additional measure of safety." It is obvious here that no warning ACL failed to give Fibreboard would have provided any "effective additional measure of safety" for plaintiffs.

[71]*See also Aluminum Co. of American v. Alm*, 785 S.W.2d 137 (Tex. 1990) (appeal following remand to court of appeals).

struck him in the eye. The cap was put on the bottle by JFW Enterprises, Inc. (JFW) utilizing a capping machine purchased by it from Alcoa, the machine's manufacturer. The retailer from whom Alm purchased the bottle had in turn purchased it from JFW. *Alm* at 589-90. "Alcoa supplied a capping machine to JFW. Alcoa knew that through use its capping machine would go out of adjustment, thereby causing misapplied caps. And Alcoa knew of the risk of personal injury from bottle cap blow off. . . ." *Id*. at 591. Alm sued Alcoa, JFW, and the retailer, but the latter two settled. The jury returned a general finding of negligence and proximate cause against Alcoa and JFW each. One allegation of negligence as against Alcoa "was that Alcoa's warning to JFW was inadequate." *Id*. at 593. Alcoa appealed the judgment on the verdict against it, and the court of appeals held for Alcoa, reasoning that the jury's finding that JFW was negligent was an implied finding that Alcoa had adequately warned JFW. *Id*. at 592. On Alm's appeal to the Texas Supreme Court, that court disagreed because "the jury could have determined that JFW was negligent without believing that Alcoa adequately warned JFW of the hazards associated with bottle cap blow off. There were, after all, other allegations of negligence against JFW." *Id*. The Supreme Court went on to review the evidence concerning whether Alcoa adequately warned JFW and stated "This evidence clearly constitutes some evidence, certainly more than a scintilla, that Alcoa inadequately warned JFW." *Id*. at 594. The Supreme Court also called attention to evidence that JFW "was not familiar with the hazards associated with misapplied caps."

80

*Id*.  It remanded the case to the court of appeals "for it to consider Alcoa's factual insufficiency points regarding the adequacy of its warning of the hazard of cap blow off to JFW."  *Id*. at 595.

While *Alm* contains some broad dicta concerning when one in a position analogous to Alcoa's might be obligated to warn consumers despite warning a party such as JFW, its clear holding is that an adequate warning to JFW would have protected Alcoa.  Obviously Alcoa did not—indeed could not have—warned Alm, or other consumers, and there is nothing to suggest the contrary (nor, plainly, did JFW warn anyone).  If failure to warn Alm (or consumers generally) could alone have supported Alcoa's liability, there would have been no occasion to remand for a determination concerning the adequacy of Alcoa's warning to JFW.  Moreover, it is clear that there was sufficient evidence that JFW was not *otherwise* knowledgeable of the relevant hazards.

*Alm* is thus distinguishable from the case at bar, in which a supplier of raw material to a sophisticated and knowledgeable manufacturer of diverse finished products which incorporate that material is held liable for failure to warn users of one type of such finished products of the dangers posed by the raw material's presence in the product.  The general rule in this connection is stated in *Restatement Third, Torts:  Products Liability* (1997) in the comments to its section 5.  Comment a to section 5 states in relevant part:

> "Product components include raw materials, bulk products,
> and other constituent products sold for integration into

other products.  Some components, such as raw materials, valves, or switches, have no functional capabilities unless integrated into other products.  Other components, such as a truck chassis or a multi-functional machine, function on their own but still may be utilized in a variety of ways by assemblers of other products.

As a general rule, component sellers should not be liable when the component itself is not defective as defined in this Chapter. . . .

The refusal to impose liability on sellers of nondefective components is expressed in various ways, such as the 'raw material supplier defense' or the 'bulk sales/sophisticated purchaser rule.'  However expressed, these formulations recognize that component sellers who do not participate in the integration of the component into the design of the product should not be liable merely because the integration of the component causes the product to become dangerously defective.  This Section subjects component sellers to liability when the components themselves are defective or when component providers substantially participate in the integration of components into the design of the other products."

Illustration 4 to section 5 gives an example which closely parallels ACL's situation:

"4.  ABC Foam Co. [here ACL] manufactures bulk foam with many different uses.  XYZ Co. [here Fibreboard] purchases bulk foam from ABC, then processes the foam and incorporates the processed foam in the manufacture of disposable dishware. *ABC becomes aware that XYZ is using processed foam in the dishware.  ABC and XYZ are both aware that there is a potential danger that processed foam may cause allergic skin reactions for some users.  ABC is aware that XYZ is not warning consumers of this potential problem.  ABC has no duty to warn XYZ or ultimate consumers* of the dangers attendant to use of the processed foam for disposable dishware. The foam sold by ABC is not defective in itself as defined in this Chapter.  A supplier of a component has no duty to warn a knowledgeable buyer of risks attendant to special application of its products when integrated into another's product. *ABC* did not participate in the design of the disposable dishware manufactured by XYZ, and *is* thus *not subject to liability* under Subsection (b)." (Emphasis added).

Comment c to section 5 focuses specifically on raw materials

and includes the following:

> "*c. Raw Materials*. Product components include raw materials. See Comment *a*. Thus, when raw materials are contaminated or otherwise defective within the meaning of § 2(a), the seller of the raw materials is subject to liability for harm caused by such defects. Regarding the seller's exposure to liability for defective design, *a basic raw material* such as sand, gravel, or kerosene *cannot be defectively designed*. Inappropriate decisions regarding the use of such materials are not attributable to the supplier of the raw materials but rather to the fabricator that puts them to improper use. The manufacturer of the integrated product has a significant comparative advantage regarding selection of materials to be used. Accordingly, *raw-materials sellers are not subject to liability for harm caused by defective design of the end-product*. The same considerations apply to failure-to-warn claims against sellers of raw materials. *To impose a duty to warn would require the seller to develop expertise regarding a multitude of different end-products and to investigate the actual use of raw materials by manufacturers over whom the supplier has no control. Courts uniformly refuse to impose such an onerous duty to warn*." (Emphasis added).

Illustration 5 to section 5 is also parallel to ACL's case here, *viz*:

> "5. LMN Sand Co. [here ACL] sells sand in bulk. ABC Construction Co. [here Fibreboard] purchases sand to use in mixing cement. LMN is aware that the improper mixture of its sand with other ingredients can cause cement to crack. ABC utilizes LMN's sand to form a cement supporting column in a building. As a result of improper mixture the cement column cracks and gives way during a mild earthquake and causes injury to the building's occupants. LMN is not liable to the injured occupants. The sand sold by LMN is not itself defective under §§ 1-4. LMN has no duty to warn ABC about improperly mixing sand for use in cement. LMN did not participate in ABC's design of the cement and is not subject to liability for harm caused by the sand as integrated into the cement."

We observe that ACL's asbestos is clearly not defective for these purposes. Under section 2 of the *Restatement Third*, a product is defective if it contains a manufacturing defect or a

design defect or because of inadequate warnings or instructions.

A manufacturing defect exists "when the product departs from its

intended design."  *Id*. § 2(a).  There is no evidence or finding

that this was the case with ACL's raw asbestos, or that it was any

different from any other chrysotile asbestos.  Comment <u>c</u> to section

5, above quoted, makes it clear that neither design defect ("a

basic raw material . . . cannot be defectively designed") nor

failure to warn or instruct ("Courts uniformly refuse to impose

such an onerous duty to warn") apply to ACL and its raw asbestos.

Comment <u>b</u>, directed at product components, contains a caveat,

stating:

> "Courts have not yet confronted the question of whether,
> *in combination*, factors *such as* the component *purchaser's*
> lack of expertise and *ignorance* of the risks of
> integrating the component into the purchaser's product,
> *and the* component *supplier's knowledge of both the
> relevant risks and the purchaser's ignorance* thereof,
> give rise to a duty on the part of the component supplier
> to warn of risks attending integration of the component
> into the purchaser's product."  (Emphasis added).[72]

The hypothetical situation given in the above quotation from

Comment <u>b</u> is in some respects arguably parallel to *Alm,* if Alcoa

there were considered the component supplier and JFW the component

purchaser, as Alcoa was knowledgeable of the risks and JFW was not,

and Alcoa knew or should have known JFW was not but failed to warn

JFW.  Here, however, there not only is no finding that ACL failed

to warn Fibreboard, but it is also clear that Fibreboard was *not*

---

[72]Comment <u>c</u>, directed at raw materials, references this caveat, stating:  "For a consideration of whether special circumstances may give rise to a duty on the part of raw-material sellers to warn of risks attending integration of raw materials with other components, see Comment *b*."

ignorant of the risks and did not lack expertise (and there is no contrary finding).  Moreover, *Alm* is also distinguishable (and the case against Alcoa there stronger than that against nondefective component suppliers) because Alcoa's capping machine and system *were defective* and were so for the only purpose for which they were intended or usable, namely putting caps on bottles.  By contrast, here ACL's raw asbestos was not itself defective, and it could be and was incorporated by Fibreboard into some of its nondefective finished products (as well being incorporated into Fibreboard insulation products).

We believe that the Texas Supreme Court would follow the *Restatement Third, Torts:  Products Liability* § 5 in this respect. *Cf. Klem v. E.I. Dupont De Nemours Co.*, 19 F.3d 997 (5th Cir. 1994) (Louisiana law).  The Texas Supreme Court has long looked to the *Restatement of Torts* as an influential guide in products liability law,[73] and has recently heavily relied on the refinements in such law reflected in *Restatement Third, Torts:  Products Liability*. *See Uniroyal Goodrich Tire Company v. Martinez*, ___ S.W.2d ___, 41 Tex. Sup. Ct. J. 1047, 1998 WL 352929 (Tex. 1998).

Applying section 5 of the *Restatement of Torts, Third: Products Liability*, as we believe the Texas Supreme Court would, we hold that no basis has been demonstrated to hold ACL liable.  Its raw asbestos, as sold to Fibreboard, was not adulterated or other

---

[73]*See, e.g., McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787, 788-89 (Tex. 1967); *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 381-83 & nn.2 & 3 (Tex. 1995) (also citing tentative draft of *Restatement Third, Torts*); *Firestone Steel Products Co. v. Barajas*, 927 S.W.2d 608, 613, 616 (Tex. 1996).

than normal chrysotile asbestos, and it was not itself defective in the sense of section 2 of the *Restatement Torts, Third*; Fibreboard was a sophisticated, expert, and knowledgeable manufacturer who produced diverse finished products into which it incorporated, after refining it, the raw asbestos purchased from ACL (and from other suppliers); not all of such finished products are shown to be defective; there is no basis for finding, and no finding, that Fibreboard either did not know exactly what it was getting from ACL or that it was unaware of the asbestos-related risks presented by its finished insulation products; ACL had no role in the design, manufacture, sale, or distribution of the insulation products at issue here (or, apparently, any other Fibreboard-finished products); ACL and Fibreboard were not affiliated; and, there is no practical way ACL could have warned plaintiffs of the risks posed by Fibreboard insulation products. These factors dictate a finding of no liability on the part of ACL to plaintiffs.

Accordingly, the judgment against ACL in the Atchison and Nations cases is reversed and judgment is here rendered that the plaintiffs in those cases take nothing from ACL.

2. Fibreboard Settlement

Because of our above holding, ACL's alternative contention that any liability it might have was discharged by the Fibreboard settlement becomes moot, and we pretermit consideration of it.

### C. Cross-Appeal

The contentions raised in plaintiffs' cross-appeal as to ACL are all rendered moot by our above holding that ACL is in any event

not liable, and we accordingly pretermit consideration of them.

## III.

## CONCLUSION

In conclusion, on Pittsburgh Corning's appeal we reverse the judgments in all the 143 phase III cases and in all 5 extrapolation cases that are before us and such cases are remanded for further proceedings not inconsistent herewith. As to Pittsburgh Corning's appeal of the judgments against it in the nine phase I cases before us, we reject all of its contentions on appeal except that relating to the date on which prejudgment interest commences to accrue; as to these same nine cases, we reject plaintiffs' cross-appeal against Pittsburgh Corning; and these nine cases, so far as they concern Pittsburgh Corning, are remanded solely to amend the judgments therein against Pittsburgh Corning so as to reflect prejudgment interest calculated from the appropriate accrual date as provided herein. With respect to ACL's appeal of the judgments against it in the Nations and Atchison cases (two of the class representative phase I cases), we reverse the judgments against ACL and render judgment in its favor; and we reject plaintiffs' cross-appeal as to ACL.[74]

---

[74]We accept all the Fed. R. App. R. 28(j) letters previously submitted. We GRANT the following motions: Pittsburgh Corning's motion to file three volumes of supplemental transcript excerpts related to claims of alleged trial bias, passion, and prejudice; motion of ACL to file corrected brief; and Pittsburgh Corning's motion to withdraw its motion to certify questions to the Supreme Court of Texas. All other pending, undisposed of motions are DENIED.

REVERSED and REMANDED in part; VACATED and REMANDED in part; REVERSED and RENDERED in part.

ENDRECORD

REYNALDO G. GARZA, Circuit Judge, specially concurring:

I write separately to concur in the excellent opinion in this case, but also to add some of my own comments and thoughts about these consolidated cases, which have burdened our judicial system for so many years. In particular, I wish to express my concerns raised by Pittsburgh Corning's attack on Judge Parker's ingenious but, unfortunately, legally deficient trial plan. This case is a striking example of the crisis presented by the state of asbestos litigation in our judicial system; therefore, I am also writing separately to further urge upon Congress the wisdom and necessity of a legislative solution.

Texas law simply provides no way around Pittsburgh Corning's right to a jury trial as to causation or the requirement that causation and damages be determined as to individuals and not groups. *See In re Fibreboard Corp.*, 893 F.2d 706, 711 (5th Cir. 1990) (stating that policy choices of State of Texas in defining "the duty owed by manufacturers and suppliers of products to consumers . . . are reflected in the requirement that a plaintiff prove both causation and damage. . . . These elements focus upon individuals, not groups."). If Judge Parker had conducted phase II according to his plan, however, rather than replacing phase II with the phase II stipulation, the only issue before us today would be the propriety of the phase III damages determinations. Of course, the majority opinion correctly explains that these damages determinations were fatally deficient under Texas law and the Seventh Amendment as to the more than 2,000 "extrapolation" cases; however, these "extrapolated" damages determinations are valuable in and of themselves as indications of an appropriate settlement range for each of the five disease categories involved.

It is clear that the enigma of asbestos litigation is not readily susceptible to resolution under the standards and practices representative of traditional tort litigation. *See Jenkins v. Raymark Industries*, 782 F.2d 468, 470 (5th Cir. 1986) ("Courts, including those in our own circuit, have been ill-equipped to handle this 'avalanche of litigation.' . . . Our numerous opinions in asbestos-related cases have repeatedly recognized the dilemma confronting our trial courts, and

89

expressed concern about the mounting backlog of cases and inevitable, lengthy trial delays."); *see also* Lester Brickman, *The Asbestos Litigation Crisis: Is There a Need for an Administrative Alternative?*, 13 CARDOZO L. REV. 1819, 1841 (1992) (arguing that "Appellate opinions arguably applying a 'there is law and there is asbestos law' doctrine can be found."). In 1991, the Judicial Conference Ad Hoc Committee on Asbestos Litigation (the "Ad Hoc Committee"), whose members were appointed by Chief Justice Rehnquist, issued a report noting that:

> What has been a frustrating problem is becoming a disaster of major proportions to both the victims and the producers of asbestos products, which the courts are ill-equipped to meet effectively.
>
> * * *
>
> The most objectionable aspects of asbestos litigation can be briefly summarized: dockets in both federal and state courts continue to grow; long delays are routine; trials are too long; the same issues are litigated over and over; transaction costs exceed the victims' recovery by nearly two to one; exhaustion of assets threatens and distorts the process; and future claimants may lose altogether.

REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 2-3 (Mar. 1991) [hereinafter AD HOC COMMITTEE REPORT]. The history of this case, up to and including our resolution of this appeal (which is dictated by binding authority) is a perfect illustration of the incompatibility of asbestos litigation and traditional tort litigation procedures.

This case also illustrates the need for a legislative response to the asbestos litigation crisis. As the majority opinion in this case notes, there is a dire need for legislative intervention in the arena of the asbestos litigation crisis. In its report, the Ad Hoc Committee argued that effective reform of the asbestos litigation crisis requires federal legislation creating a national asbestos dispute-resolution scheme. AD HOC COMMITTEE REPORT 3, 27-35. The Judicial Conference of the Untied States adopted the Ad Hoc Committee's recommendations, and urged Congress to "consider a national legislative scheme to come to grips with the impending disaster relating to resolution of asbestos personnel injury disputes, with the objectives of achieving timely, appropriate compensation of present and future asbestos victims and of maximizing the prospects for the economic survival and viability of defendants." REPORT OF THE PROCEEDINGS OF THE

JUDICIAL CONFERENCE OF THE UNITED STATES 33 (Mar. 12, 1991). More recently, the Supreme

Court discussed the Ad Hoc Committee's report and the Judicial Conference's recommendations

to Congress, noting that "[t]o this date [June 25, 1997], no congressional response has emerged."

*Amchem Products, Inc. v. Windsor*, 117 S. Ct. 2231, 2237-38 (1997).

As the majority opinion convincingly establishes, the trial plan which the district court

implemented below was legally deficient. As to the 160 phase III "sample" plaintiffs, who tried

their cases to a jury regarding damages, the trial plan was inconsistent with the requirement of

Texas law that determinations of causation be made as to "individuals, not groups." *See

Fibreboard*, 893 F.2d at 711. The stipulation that replaced phase II established only that "some"

individuals working in each of the listed crafts during each of the relevant time periods at each of

the 22 work sites were "exposed to asbestos [with] sufficient length and intensity to cause

pulmonary asbestosis of varying degrees," and that a Pittsburgh Corning asbestos product was

present at those sites during two of the relevant time periods. As such, the stipulation was not

sufficiently individualized, as it would have been if Pittsburgh Corning had stipulated that "all" of

the plaintiffs were so exposed.

As to the "extrapolation" plaintiffs, the same rationale applies with respect to the issue of

causation. Additionally, however, the extrapolation cases were deficient with regard to the

determination of actual damages. In contrast to the "sample" phase III cases, no jury ever

considered the "extrapolation" cases, and neither the court nor a jury made any individualized

determinations of actual damages, as required by Texas law. *See Fibreboard*, 893 F.2d at 711. It

is for these reasons that we are reversing the judgments in the phase III "sample" cases and the

"extrapolation" cases.

It appears, however, that Judge Parker's phase II plan would have been sufficient if he had

implemented the plan rather than disposing of it with the phase II stipulation. Under the plan,

phase II would have addressed exposure on a craft and work site basis during the relevant time

periods. A jury would have made exposure findings regarding specific work sites, crafts, and time

periods. The jury would have heard evidence regarding the presence of the defendants' asbestos products and asbestos dust at each work site. The jury would also have heard evidence about the nature of the different crafts at each work site and the relationship of those crafts to asbestos. Additionally, the jury would have heard evidence regarding working conditions at each work site and the relationship of those conditions to the defendants' products.

The presentation of such evidence would clearly be sufficient for a reasonable jury to conclude that the presence of the defendants' products caused injuries to individuals working in certain crafts at certain work sites during certain time periods, and how long of a time period would be sufficient to support such causation. The jury would have also heard evidence regarding the presence of the defendants' products at the relevant work sites during the relevant time periods. Based on that evidence, the jury would have apportioned responsibility among the settling and non-settling defendants. The court would then make a determination of which plaintiffs worked for sufficient periods of time at each work site and which plaintiffs were members of each craft at those work sites.

The evidence, if presented as the plan anticipated, would satisfy the plaintiffs' burden of proof, and would support a reasonable jury's determination of causation specific to craft, work site, and relevant time period. Such evidence would also support a determination of the length of time on the job required to support causation. As such, the court's task of simply plugging each plaintiff into a craft, work site, and time period would be a sufficiently individualized determination of causation for the district court to grant judgment as to the causation issue.[75]

_____

[75]If the defendants' contested causation as to any particular plaintiff (for example, if a particular plaintiff could have sustained his or her injury, in whole or in part, as a result of excessive smoking), they could file a motion opposing judgment as to that plaintiff with supporting affidavits discussing the specific evidence that should preclude judgment as to that plaintiff. Although this process could, potentially, still result in the necessity of several plaintiff-specific determinations, it would at least dispose of the causation issue as to many of the plaintiffs. Alternatively, and perhaps preferably, if the
(continued...)

The question of damages, however, is another story. The inescapable reality is that Texas law requires that determinations of damages be made as to individuals, not as to groups, and this Court is powerless to alter that reality. As stated, the Ad Hoc Committee's report concluded that the only real solution to the problems posed by the asbestos litigation crisis lies with Congress, but the Ad Hoc Committee continued that "[a]t the same time, or failing congressional action, the federal judiciary must itself act now to achieve the best performance possible from the system under current law." AD HOC COMMITTEE REPORT 4. Judge Parker made a valiant and admirable effort to take such action. Unfortunately, however, this Court is without the power to sanction or condone his approach.

Although resolution of these cases, under the current state of law, would require an inordinate number of damages trials, the parties involved should not lightly cast aside the figures that Judge Parker arrived at in phase III as representative of actual damages in each category of disease. In arriving at these figures, Judge Parker tried 160 individual "sample" cases from each of the five disease categories represented by the pool of plaintiffs. The two juries that tried those 160 cases determined only whether each particular "sample" plaintiff suffered from an asbestos-related disease or injury and, if so, the amount of damages incurred. Following the trials, Judge Parker held a one day hearing after which he determined that the "sample" cases within each disease category were reliably representative of the more than 2,000 remaining "extrapolation" cases. Judge Parker then assigned each "extrapolation" case to a disease category and awarded actual damages equal to the average of the awards in the "sample" cases involving the same disease.

In sum, the judiciary's utter inability to adequately address the seemingly insurmountable

_____

(...continued)
defendants contend that a plaintiff's injury was the result of something other than the defendants' products, they could address that contention during the damages phase, at which time (as the majority opinion in this case makes clear) a jury must determine each plaintiffs' damages on an individualized basis.

93

problems posed by asbestos litigation further underscores the need for legislative action.

Nevertheless, although the procedure outlined above does not satisfy the demands of Texas law

requiring individual determinations of damages, the parties should take notice of these figures as

representative of an appropriate settlement range within each disease category.  Such notice is

particularly advisable for Pittsburgh Corning, against whom the phase I jury awarded a three to

one punitive damages multiplier (i.e., $3.00 of punitive damages for every $1.00 of actual

damages).

I tend to agree with Judge Thomas F. Hogan's Separate Dissenting Statement to the Ad

Hoc Committee's report.[76]  Judge Thomas acknowledged the "national crisis involving asbestos

litigation," but expressed concern with the Ad Hoc Committee's recommendation that, if

Congress chose not to accept the Committee's recommendation of a national legislative scheme

to deal with asbestos claims, Congress should consider legislation to expressly authorize the

consolidation and collective trial of asbestos cases in order to expedite disposition of cases in

federal courts with heavy asbestos personal injury caseloads.  AD HOC COMMITTEE REPORT 41-43

(Separate Dissenting Statement of Judge Thomas F. Hogan).  Judge Hogan stated:

> My concern is the underlying premise of the report regarding the use of class action
> "collective" trials (trials by aggregation of claims) of asbestos cases.  It is a novel and
> radical procedure that has never been accepted by an appellate court.  It has been
> challenged as being constitutionally suspect in denying defendants their due process and
> jury trial rights as to individualized claimants, as well as conflicting with the court's
> obligations to apply state law. . . .
>
> This recommendation, aside from the constitutional question, as a practical matter
> may well prove impossible to execute.  *See generally*, the reference to the *Cimino* trial
> (*passim*) [referring, ironically, to the present case].  Trial by aggregation of claims and
> then the extrapolation of the damages by the court has been recognized by the Committee
> itself as being "the most radical solution . . . ." *See* Report at 21.  As mentioned, it has
> never been approved by any appellate court.

---

[76]The members of the Ad Hoc Committee were Judge Thomas M. Reavley (Chairman), Judge David D. Dowd, Jr., Judge Thomas F. Hogan (who filed a Separate Dissenting Statement), Judge John F. Nangle, Judge Robert M. Parker (the same Judge Parker who tried the cases before us on this appeal, except that he is now a Fifth Circuit Judge) and Judge Sam C. Pointer, Jr.

*Id.* at 41.

Our decision in this case shows that Judge Hogan's prophecy rang true. Judge Hogan did agree that "a national solution is the only answer." *Id.* at 42. He continued, however, that "[s]ince the aggregation or collective trial method is highly questionable, a logical and viable solution would be the passage by Congress of an administrative claims procedure similar to the Black Lung legislation." *Id.* Judge Hogan concluded:

> There already exists a model to follow in the Black Lung program. If there is to be any Conference action, it is hoped the Conference would suggest that Congress consider such an approach.

*Id.* at 43.

I agree with Judge Hogan's comments. Obviously, the type of consolidation attempted in this case is unworkable in practice. *Fibreboard* and the majority opinion in this case make that much abundantly clear. As I have discussed, it is also apparent that the federal judiciary has not been able to formulate an appropriate response to the asbestos litigation crisis. In fact, this case suggests that we may be without the power to do so.

As such, there must be some alternative solution. The power to devise such a solution lies solely in the halls of Congress. Although I do not express any opinion on the strengths and weaknesses of the Federal Black Lung Program as implemented, the underlying concept of setting up an administrative claims procedure to handle a massive amount of claims for disabling employment-related impairments makes sense in the context of dealing with claims for asbestos-related injuries. Congress promulgated the Black Lung Program to rectify the historical lack of adequate state compensatory schemes for miners suffering from pneumoconiosis. 30 U.S.C. § 901 (1998). Similarly, asbestos-related injuries have presented the courts with an unmanageable situation, which has resulted in an inadequate method of compensation for such injuries, both from the plaintiffs' and defendants' point of view. As such, I join Judge Hogan in urging Congress to formulate an administrative claim procedure for dealing with claims for asbestos-related injuries modeled on the Black Lung legislation.

In conclusion, I agree with the rationale and the result which the majority opinion has reached.  Our hands are tied by the United States Constitution.  We must respect Texas law and the Seventh Amendment.  As the Ad Hoc Committee noted:

> The picture is not a pretty one.  Decisions concerning thousands of deaths, millions of injuries, and billions of dollars are entangled in a litigation system whose strengths have increasingly been overshadowed by its weaknesses.

AD HOC COMMITTEE REPORT 2 (quoting statements of the Institute for Civil Justice of the Rand Corporation).  This statement still holds true; however, the picture is much worse today.  I implore Congress to heed the plight of the judiciary and the thousands of individuals and corporations involved.  Congress alone has the power to devise a system to even attempt to alleviate these most pressing of concerns.  Congress utilized this power in response to the plight of the coal miners.  Simply stated, it is Congress' duty and responsibility to do the same in response to the asbestos litigation crisis.